# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Personal Restraint Petition of: | ) ) ) ) | No. 73278-1-I |
| MICHAEL JAMES MORRIS, | ) ) ) | DIVISION ONE |
| Petitioner. | ) ) ) ) ) ) ) ) | UNPUBLISHED<br><br>FILED: July 13, 2015 |

Cox, J. — Michael James Morris seeks collateral relief from the judgment and sentence following his conviction of first degree assault of his six-week-old baby, A.M. Because he fails in his burden to show that he was actually and substantially prejudiced by his trial counsel's performance, we deny his petition for relief.

A jury convicted Morris of assault in the first degree.[1] The conviction was based on an incident that occurred on May 29, 2009. On that night, Brittany Morris, A.M.'s mother, left A.M. in Morris's care.[2] When she left, Morris was sitting on the couch starting to feed A.M. from a bottle.[3]

---

[1] State v. Morris, noted at 173 Wn. App. 1013, 2013 WL 503140, at *1.

[2] Id.

[3] Id.

Approximately 10 minutes after Brittany[4] left, Morris ran with A.M. in his arms across the street to a neighbor's house.[5] Morris told the neighbor that something was wrong with A.M., that she had suddenly started vomiting, and that he needed a ride to the hospital.[6] During the drive to the hospital, A.M. was gasping and having difficulty breathing.[7] By the time they arrived at the hospital, A.M.'s skin was blue and she was limp and not breathing.[8]

A.M. was immediately transferred to Harborview Medical Center.[9] She was admitted to the intensive care unit, where a team of doctors treated her. An ophthalmologist examined her and found severe bleeding in both of her retinas.[10]

Two days later, Dr. Kenneth Feldman examined A.M.[11] Dr. Feldman said that A.M. was not "responding as a normal child would respond at six weeks of age."[12] He testified at trial that A.M. had blood in the white of her left eye and "a tremendous amount of bleeding within the retina."[13] He also testified that she

---

[4] Due to the similarity in names, this opinion uses Brittany Morris's first name for clarity.

[5] Morris, 2013 WL 503140, at *1.

[6] Id.

[7] Id.

[8] Id.

[9] Id.

[10] Id.

[11] Id. at *2.

[12] Id. (internal quotation marks omitted).

[13] Id. (internal quotation marks omitted).

2

had a bruise under the chin and her fontanel was "quite full and quite tense," which suggested that there was "extra pressure inside [her] head."[14] His preliminary diagnosis was abusive trauma.

Later that day, A.M. was transferred to Seattle Children's Hospital. An MRI confirmed that there was bleeding in A.M.'s brain and that areas of her brain were "quite damaged."[15]

At Children's, pediatric ophthalmologist Dr. Erin Herlihy, who also testified at trial, examined A.M. on the day following Dr. Feldman's examination.[16] She found severe bleeding in A.M.'s eyes and signs of "severe traumatic injury."[17] A.M. was partially paralyzed.[18]

A police officer interviewed Morris shortly after the incident. He told the officer that he ran across the street without supporting A.M.'s head.[19] He then told the officer that he accidentally dropped A.M. on his lap and "jogged" her head.[20] In a written statement, Morris said that on May 29, he shook A.M. because she was not breathing.[21] He said that he shook her twice, shaking her

---

[14] Id. (internal quotation marks omitted).

[15] Id. (internal quotation marks omitted).

[16] Id.

[17] Id. (internal quotation marks omitted).

[18] Id.

[19] Id.

[20] Id. (internal quotation marks omitted).

[21] Id.

3

harder the second time.[22] Morris also sent a text message to Brittany admitting that he shook A.M. and apologizing for doing so.[23]

Thereafter, the State charged Morris with assault of a child in the first degree. It alleged as an aggravating factor that Morris knew or should have known that A.M. was particularly vulnerable and incapable of resistance.[24]

At trial, the State called a number of witnesses including several treating doctors, social workers, Brittany Morris, Dr. Feldman, and Dr. Herlihy.[25] Dr. Feldman testified that the most likely cause of A.M.'s injuries was "abusive head trauma" resulting from "whiplash forces."[26] Similarly, Dr. Herlihy testified that to cause this type of hemorrhages in the retina, there must have been an "acceleration/deceleration force, something that would cause a shearing type of injury to tear blood vessels."[27]

The defense theory was that an acceleration/deceleration force did not cause A.M.'s injuries. The defense called Dr. Steven Gabaeff and Dr. Patrick Barnes.[28] Dr. Gabaeff testified that the most likely cause of A.M.'s injury to the brain was viral meningitis.[29] Dr. Barnes testified that the most likely cause was

---

[22] Id.

[23] Id.

[24] Id.

[25] Id. at *3.

[26] Id. (internal quotation marks omitted).

[27] Id.

[28] Id.

[29] Id.

4

lack of oxygen or blood flow, and the next most likely causes were a "bleeding or a clotting problem," infection, or "accidental or nonaccidental injury."[30]

The jury convicted Morris as charged. Morris appealed, arguing that insufficient evidence supported the conviction. This court affirmed the conviction.[31]

Morris timely moved for relief of judgment pursuant to CrR 7.8(c)(2). The superior court transferred his motion to this court for consideration as a personal restraint petition.

## INAFFECTIVE ASSISTANCE OF COUNSEL

Morris first argues that he was denied his right to effective assistance of counsel. Specifically, he argues that his trial counsel "failed to competently challenge the State's expert's opinion on causation" and failed to expose the flaws in the State's case.[32] We disagree.

To obtain relief on collateral review based on constitutional error, the petitioner must demonstrate by a preponderance of the evidence that he was actually and substantially prejudiced by the error.[33] But "if a personal restraint petitioner makes a successful ineffective assistance of counsel claim, he has necessarily met his burden to show actual and substantial prejudice."[34]

---

[30] Id. (internal quotation marks omitted).

[31] Id. at *9.

[32] Memorandum in Support of CrR 7.8 Motion for Relief from Judgment or Order at 1.

[33] In re Pers. Restraint of Davis, 152 Wn.2d 647, 671-72, 101 P.3d 1 (2004).

[34] In re Pers. Restraint of Crace, 174 Wn.2d 835, 846-47, 280 P.3d 1102 (2012).

5

The right to counsel includes the right to effective assistance of counsel.[35] An ineffective assistance of counsel claim has two components.[36] If a defendant cannot demonstrate either component, the ineffective assistance of counsel claim fails.[37]

First, the defendant must show that counsel's performance was deficient.[38] This requirement involves showing that counsel's performance "fell below an objective standard of reasonableness."[39] Judicial scrutiny of counsel's performance is "highly deferential."[40]

We make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."[41] "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"[42] "There are countless ways to provide

---

[35] Strickland v. Washington, 466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); State v. Crawford, 159 Wn.2d 86, 97, 147 P.3d 1288 (2006).

[36] Strickland, 466 U.S. at 687.

[37] Id. at 697; State v. Foster, 140 Wn. App. 266, 273, 166 P.3d 726 (2007).

[38] Strickland, 466 U.S. at 687.

[39] Id. at 688.

[40] Id. at 689.

[41] Id.

[42] Id. (quoting Michel v. State of La., 350 U.S. 91, 101, 76 S. Ct. 158, 100 L. Ed. 83 (1955)).

effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way."[43]

Second, the defendant must show that the deficient performance prejudiced the defense.[44] Prejudice is defined as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[45] "A reasonable probability is a probability sufficient to undermine confidence in the outcome."[46]

### Frye and ER 702

Morris first argues that his trial counsel "failed to competently challenge the State's expert's opinion on causation."[47] Specifically, he asserts that Dr. Feldman's causation testimony was inadmissible under both Frye v. United States[48] and ER 702. We disagree.

Washington courts evaluate expert testimony under the Frye test.[49] "The Frye standard requires a trial court to determine whether a scientific theory or principle 'has achieved general acceptance in the relevant scientific community'

---

[43] Id.

[44] Id. at 687.

[45] Id. at 694.

[46] Id.

[47] Memorandum in Support of CrR 7.8 Motion for Relief from Judgment or Order at 1.

[48] 293 F. 1013, 34 A.L.R. 145 (D.C. Cir. 1923).

[49] In re Det. of Thorell, 149 Wn.2d 724, 754, 72 P.3d 708 (2003).

before admitting it into evidence."[50] "'[T]he core concern . . . is only whether the evidence being offered is based on established scientific methodology.'"[51]

If the Frye test is satisfied, the trial court must then determine whether to admit expert testimony under ER 702.[52] That rule has a two part test.[53] The court first considers whether the witness qualifies as an expert, and second, whether the expert's testimony would be helpful to the trier of fact.[54]

Here, Dr. Feldman testified that A.M. suffered "abusive head trauma."[55] He testified that A.M.'s brain injury is typically the result of "whiplash forces."[56] And he testified that shaking is a force that causes whiplashes and could potentially cause such injuries.[57] But he testified that he did not know the specific mechanism that caused A.M.'s injury because he was not in the room when it happened.[58]

This testimony satisfied the Frye standard. Abusive head trauma as a diagnosis, and shaking as a cause of such injuries, are generally accepted

---

[50] Id. (internal quotation marks omitted) (quoting In re Pers. Restraint of Young, 122 Wn.2d 1, 56, 857 P.2d 989 (1993)).

[51] Id. (alterations in original) (internal quotation marks omitted) (quoting Young, 122 Wn.2d at 56).

[52] State v. Copeland, 130 Wn.2d 244, 256, 922 P.2d 1304 (1996).

[53] Id.

[54] Id.

[55] Report of Proceedings (June 3, 2011) at 13.

[56] Id. at 5.

[57] Id. at 7.

[58] Id. at 16-17.

theories in the relevant scientific community. At trial, the State offered position papers from the American Academy of Pediatrics, the Academy of Ophthalmology, and the National Association of Medical Examiners, as well as a publication from the Centers for Disease Control and Prevention.[59] Each of these recognizes abusive head trauma and accepts shaking as a mechanism for injury.

Further, the State now presents a 2011 article listing various international and domestic medical organizations "that have publicly acknowledged the validity of [abusive head trauma] as a medical diagnosis."[60] Among the 15 listed is the World Health Organization.[61] The article further states that "it is virtually unanimous among national and international medical societies that [abusive head trauma] is a valid medical diagnosis."[62] And it states that while some courts have concluded that the diagnosis is based on inconclusive research, the vast majority have not.[63] In short, Dr. Feldman's testimony was not inadmissible under Frye.

Dr. Feldman's testimony also satisfied ER 702. Dr. Feldman clearly qualified as an expert. He had practiced pediatric medicine for 40 years at the

_____

[59] State's Motion to Transfer Motion for Relief from Judgment, Ex. 5 (Trial Exhibits 28, 29, 30, 31).

[60] Id. at Ex. 6 (Dr. Sandeep Narang, A Daubert Analysis of Abusive Head Trauma/Shaken Baby Syndrome, 11 HOUS. J. HEALTH L. & POL'Y 505, 574-76 (2011)).

[61] Dr. Narang, supra, at 574-76.

[62] Id. at 583.

[63] Id. at 593.

time of trial and had worked as a child abuse specialist for 28 years.[64] He is board certified in pediatrics and child abuse pediatrics.[65] And Dr. Feldman's testimony was helpful to the trier of fact. "Expert testimony is helpful if it concerns matters beyond the common knowledge of the average layperson and does not mislead the jury."[66] Here, the medical testimony was beyond the common knowledge of the average layperson and was central to the issue of causation.

Moreover, Dr. Feldman's testimony did not mislead the jury. He testified that he reached his diagnosis by conducting a "differential diagnosis," where he systematically excluded other possible causes of the injury.[67] And he explained this process to the jury.[68] As Morris acknowledges, the differential diagnosis methodology is a reliable method of ascertaining causation.[69] And courts have held that this methodology is well-recognized and reliable.[70]

Further, Dr. Feldman testified that there is "a lot of skepticism whether shaking can cause these injuries" and "a lot of skepticism for the evidence base

---

[64] Report of Proceedings (June 2, 2011) at 96-97.

[65] Id. at 102, 109.

[66] State v. Thomas, 123 Wn. App. 771, 778, 98 P.3d 1258 (2004).

[67] Report of Proceedings (June 2, 2011) at 122; Report of Proceedings (June 3, 2011) at 13.

[68] See Report of Proceedings (June 3, 2011) at 2-13.

[69] See Memorandum in Support of CrR 7.8 Motion for Relief From Judgment or Order at 20.

[70] Dr. Narang, supra, at 585.

behind it."[71] He explained the literature that supported his belief as well as the literature that disputed it. [72] Thus, he presented the jury with accurate information about the conflicting science.

In sum, given the evidence of general acceptance in the relevant scientific community, Morris fails to show that counsel's performance was deficient for failing to insist on a Frye hearing.

Likewise, Morris fails to show that his counsel's performance was deficient for failing to challenge this evidence under ER 702. It is reasonable to conclude that trial counsel's decision to challenge Dr. Feldman's testimony through cross-examination was strategic. We note that Morris fails to present a declaration from his trial counsel to indicate otherwise. This omission is telling.

Finally, "[T]here is no ineffectiveness if a challenge to admissibility of evidence would have failed."[73] That principle controls here.

For these reasons, Morris also cannot demonstrate prejudice.

Morris relies on Bowers v. Norfolk Southern Corporation to distinguish a "differential diagnosis" from a "differential etiology."[74] In general, a "differential diagnosis" is focused on diagnosing the disease, and a "differential etiology" is focused on determining the cause of the disease.[75] In Bowers, the court stated

---

[71] Report of Proceedings (June 3, 2011) at 21.

[72] Id. at 21-29, 40-47.

[73] State v. Nichols, 161 Wn.2d 1, 14-15, 162 P.3d 1122 (2007).

[74] Memorandum in Support of CrR 7.8 Motion for Relief from Judgment or Order at 20 (citing Bowers v. Norfolk S. Corp., 537 F. Supp. 2d 1343, 1360 (M.D. Ga. 2007)).

[75] See Bowers, 537 F. Supp. 2d at 1360-62.

that a differential diagnosis is inherently reliable but a differential etiology is not.[76] Morris asserts that Dr. Feldman conducted a differential etiology.

This is unpersuasive. As already explained, Dr. Feldman reached his conclusion though a differential diagnosis. He systematically excluded other conditions in order to reach a valid diagnosis of abusive head trauma. And he was not focused on the specific mechanism that caused the injuries. In short, Bowers is distinguishable.

Morris next makes several arguments that Dr. Feldman's testimony was unreliable. Most of his challenges go to the weight, not the admissibility, of the testimony. And none of his arguments are persuasive.

First, Morris argues that Dr. Feldman's opinion is unreliable because "his diagnosis ruled in a cause incapable of causing the injuries at issue."[77] Morris asserts that Dr. Feldman testified that A.M. was injured by violent shaking. And he argues that "it has been repeatedly shown that shaking does not achieve the level of force necessary to inflict the injuries at issue."[78] In support of this assertion, Morris cites several "biomechanical" studies.

This argument is unpersuasive for two reasons. First, Morris mischaracterizes Dr. Feldman's testimony. Dr. Feldman did not testify that violent shaking caused A.M.'s injuries. Rather, Dr. Feldman explicitly testified that he did not know the specific mechanism that caused A.M.'s injury.

---

[76] Id. at 1361.

[77] Memorandum in Support of CrR 7.8 Motion for Relief from Judgment or Order at 17.

[78] Id. at 18.

Second, while some biomechanical studies do undermine the theory that shaking can cause such injuries, these studies are not conclusive. As a 2009 Policy Statement from the American Academy of Pediatrics states, "Biomechanical modeling has since been used to both support and refute the contributions of shaking or impact to abusive head trauma."[79]

Further, other studies indicate that shaking *can* cause the kind of injuries observed in A.M. For example, a 2010 Information Statement from the American Academy of Ophthalmology states, "Currently, there is abundant evidence from multiple sources (perpetrator confessions, clinical studies, postmortem studies, mechanical models, animal models and finite element analysis) that repetitive acceleration-deceleration with or without head impact is injurious . . . ."[80]

Moreover, Dr. Feldman acknowledged that there is skepticism whether shaking can cause such injuries.[81] He testified about the most commonly cited biomechanical study and explained why he thought that it was flawed.[82] And he criticized reliance on biomechanical studies, explaining that these studies use adult monkeys or dummies, and that neither is the same as an infant.[83] In short,

---

[79] State's Motion to Transfer Motion for Relief from Judgment, Ex. 5 (American Academy of Pediatrics, Policy Statement: Abusive Head Trauma in Infants and Children, PEDIATRICS, Vol. 123, No. 5, 1409, May 2009).

[80] State's Motion to Transfer Motion for Relief from Judgment, Ex. 5 (American Academy of Ophthalmology, Information Statement: Abusive Head Trauma/Shaken Baby Syndrome, May 2010).

[81] Report of Proceedings (June 3, 2011) at 21.

[82] Id. at 22-25.

[83] Id. at 27-28.

13

the fact that there are differences in medical opinion go to the weight of Dr. Feldman's testimony, not the admissibility of it.[84]

Second, Morris contends that Dr. Feldman's opinion is unreliable because "the current knowledge base does not support making definitive conclusions on causation."[85] He asserts that "injury thresholds and how infant tissue responds to repetitive forces still have not been established."[86] And he argues that because injury thresholds and levels of force are "inherent components to determining causation," the lack of reliable information renders Dr. Feldman's testimony speculative.[87]

In support of this argument, Morris cites Del Prete v. Thompson.[88] In that case, Jennifer Del Prete was convicted of first degree murder of a child based on a theory that the child had suffered abusive head trauma and Del Prete had caused the injuries.[89] She petitioned for federal habeas relief and the district court concluded that she had established that no reasonable jury would find her guilty beyond a reasonable doubt.[90] In reaching this conclusion, the court stated

---

[84] See Thorell, 149 Wn.2d at 756; In re Det. of Campbell, 139 Wn.2d 341, 358, 986 P.2d 771 (1999).

[85] Memorandum in Support of CrR 7.8 Motion for Relief from Judgment or Order at 21.

[86] Id.

[87] Id. at 23.

[88] 10 F. Supp. 3d 907 (N.D. Ill. 2014).

[89] Id. at 909, 916.

[90] Id. at 958.

that the lack of an established injury threshold provided "a newfound basis for skepticism about causation and mechanism testimony . . . ."[91]

But again, this argument ignores the fact that Dr. Feldman testified that he did not know the specific mechanism that caused A.M.'s injury. It also ignores the fact that there are studies that *do* support making definitive conclusions on causation. Additionally, reliance on Del Prete is misplaced. The evidence in that case was new evidence, while in this case, the conflicting evidence was explored at trial. For these reasons, Morris fails to establish that Dr. Feldman's testimony was speculative.

Third, Morris asserts that Dr. Feldman's opinion is unreliable because "the evidence-base for shaking is admittedly weak and non-scientific."[92] He points out that the evidence base for shaking is confessions. And he argues that confessional studies are problematic because perpetrator admissions are "hardly scientific and are a known source of wrongful convictions."[93]

It is true that several of these studies rely on perpetrator confessions in order to determine whether there are characteristic injuries that indicate abuse. And Dr. Feldman testified that he relied on these studies and confessional data. But the scientists who conducted these studies considered the confessions reliable. We reject Morris's invitation to conclude that these confessional studies are unreliable as a matter of law. Further, other studies support abusive head

---

[91] Id. at 954.

[92] Memorandum in Support of CrR 7.8 Motion for Relief from Judgment or Order at 24.

[93] Id. at 25.

trauma as a diagnosis. As one recent article states, "[T]here have been at least eight systematic reviews, over fifteen controlled trials, over fifty comparative cohort studies or prospective cases series, and numerous well-designed, retrospective case series/reports, comprising thousands of cases, *supporting* the diagnosis of [abusive head trauma]."[94]

Fourth, Morris argues that epidemiological data illustrates the unreliability of Dr. Feldman's conclusions.[95] In support, he points to a study that analyzed the Kids' Inpatient Database between 2000 and 2009.[96] He asserts that, contrary to Dr. Feldman's conclusions, this study shows that subdural hematomas and retinal hemorrhages are very poor indicators of abusive head trauma.[97]

But again, other studies support the conclusion that these symptoms are reliable indicators of abuse. For example, one article cited by the State indicates that there is "a clear, strong, and highly statistically significant association of [subdural hematomas] and [retinal hemorrhages] with trauma."[98] These conflicting studies present issues of weight, not admissibility.

Fifth, Morris argues that A.M.'s post trial head injury illustrates the unreliability of Dr. Feldman's conclusion.[99] He submits medical records from

---

[94] Dr. Narang, supra, at 540 (emphasis in original).

[95] Memorandum in Support of CrR 7.8 Motion for Relief from Judgment or Order at 29-30.

[96] Id. at 29.

[97] Id.

[98] Dr. Narang, supra, at 571.

[99] Memorandum in Support of CrR 7.8 Motion for Relief from Judgment or Order at 30-31.

2011, indicating that, after this trial, A.M. suffered another head injury while with a babysitter in Missouri. He asserts that doctors in Missouri similarly concluded that the injuries were indicative of abuse. And he argues that "like Dr. Feldman, the doctors in Missouri are, erroneously, assuming the presence of the same medical findings are reliable indicators for abuse."[100]

But this evidence does not establish that Dr. Feldman's testimony was unreliable. In fact, this evidence appears to support Dr. Feldman's opinion, as it indicates that other doctors believe abuse can be a cause of similar injuries.

Finally, Morris argues that "[t]rial counsel's failure to know the biomechanical literature and the history of [the abusive head trauma] hypothesis, confirming that the evidence-base for shaking is weak and now anchored in confessions only, is inexcusable."[101] But the record does not support the assertion that trial counsel failed to know the biomechanical literature or the evidence-base for shaking. She adequately cross-examined Dr. Feldman on these topics, as we discuss next.

### Cross-Examination

Morris next argues that his trial counsel failed to effectively confront the State's "misleading evidence."[102] We disagree.

---

[100] Id. at 31.

[101] Id. at 27.

[102] Id. at 31.

17

Decisions on how to conduct cross-examination are strategic.[103] "'The extent of cross-examination is something a lawyer must decide quickly and in the heat of the conflict.'"[104] It is "'a matter of judgment and strategy.'"[105]

First, Morris contends that it was misleading for Dr. Feldman to give "[t]he impression that the evidence-base in support of [abusive head trauma] is strong."[106] And he argues, in general, that trial counsel should have pointed out that the evidence base for abusive head trauma is weak.

But trial counsel questioned Dr. Feldman about the evidence base in support of abusive head trauma. She asked Dr. Feldman about the portion of the medical community that questions the theory, including the biomechanics sector.[107] And Dr. Feldman acknowledged that "[t]here are a few biomechanical physicians who question [the theory]."[108]

Trial counsel also asked Dr. Feldman about the lack of witnesses and the lack of literature:

> [Trial counsel]: It's never been witnessed that shaking causes these injuries?
>
> [Dr. Feldman]: As far as I know, right.

---

[103] In re Pers. Restraint of Stenson, 142 Wn.2d 710, 736, 16 P.3d 1 (2001).

[104] Davis, 152 Wn.2d at 720 (quoting State v. Stockman, 70 Wn.2d 941, 945, 425 P.2d 898 (1967)).

[105] Id. (quoting Stockman, 70 Wn.2d at 945).

[106] Memorandum in Support of CrR 7.8 Motion for Relief from Judgment or Order at 32.

[107] Report of Proceedings (June 3, 2011) at 41-44.

[108] Id. at 41.

[Trial counsel]: Now, that's part of the evidence-based medicine we talked about, correct?

[Dr. Feldman]: It is.

[Trial counsel]: And, again, there's no literature about that in this field?

[Dr. Feldman]: Right. That, obviously, would be the gold standard, but we don't have it yet.[109]

Further, trial counsel pointed to two studies, the "Donohoe study" and a study by Dr. Leetsma, to attempt to demonstrate that the evidence base was weak:

[Trial counsel]: And there was an article by Dr. Leetsma in 2001, I believe, correct?

[Dr. Feldman]: Correct.

[Trial counsel]: And he essentially confirmed Dr. Donohue—I believe you said Donohue, D-O-N-O-H-O-E?

[Dr. Feldman]: Yeah.

[Trial counsel]: That the evidence base was weak, correct?

[Dr. Feldman]: Yeah. Leetsma, again, did a very poor study to come to his conclusions. He only included case reports that had individual data. He ignored all of the body of literature that had some data on a number of patients. So he came to the conclusion that he desired to come to, but there wasn't a good database, but it was a lousy review.

[Trial counsel]: And he looked at 54 cases from 1969 to 2001?

[Dr. Feldman]: Correct.

[Trial counsel]: And, again, he concluded that there wasn't enough evidence base to support this?

---

[109] Id. at 45-46.

[Dr. Feldman]: That was his conclusion.[110]

In short, trial counsel adequately questioned Dr. Feldman about the evidence base in support of abusive head trauma. Morris fails to show deficient performance.

In general, Morris argues that trial counsel should have questioned Dr. Feldman on his criticisms of the Donohoe study, should have pointed out that the underlying data supporting the theory relies on confessions, and should have pointed out flaws in studies relied on by Dr. Feldman such as the problem of "circular bias."

But, as Strickland notes, "Even the best criminal defense attorneys would not defend a particular client in the same way."[111] Thus, the strategic choices trial counsel made in this case do not require us to conclude that counsel performed deficiently. Moreover, it is not clear that further questioning would have discredited Dr. Feldman. The Donohoe study, criticized by Dr. Feldman, is criticized by others as well.[112] And while circular bias is an acknowledged problem, one article cited by the State indicates that there have been numerous well-designed studies set out to control circularity.[113]

Second, Morris contends that it was misleading for Dr. Feldman to claim that the injuries could be precisely timed. And he argues that trial counsel should

---

[110] Id. at 46.

[111] Strickland, 466 U.S. at 689.

[112] See Dr. Narang, supra, at 533.

[113] Id. at 562.

20

have used available studies on the topic of "lucid intervals" to establish that the injury could not be precisely timed due to the fact that an infant may appear normal before developing severe symptoms.

But Dr. Feldman did not claim that this injury could be precisely timed. Rather, he testified that there "should be" some behavioral alteration in the child at the time of the event and that the "vast majority" of studies indicate that children are immediately symptomatic.[114] Further, Dr. Feldman acknowledged that lucid intervals can happen, but he testified that they usually occur in cases with milder injuries and that was "not really the scenario we have here."[115]

In any event, trial counsel questioned Dr. Feldman on the topic of timing. On cross-examination, Dr. Feldman admitted that while he had indicated that 95 percent of the time there is an immediate onset of symptoms, 95 percent is a number that he "just pulled . . . out of the air."[116] Thus, trial counsel obtained Dr. Feldman's concession that children are not always immediately symptomatic and her questioning suggested that Dr. Feldman's conclusion was unsupported.

Trial counsel also questioned Dr. Feldman about lucid intervals.[117] On cross-examination, he conceded that a lucid interval can last a few minutes or "may stretch out to a couple days."[118] Further, trial counsel questioned Dr.

---

[114] Report of Proceedings (June 3, 2011) at 17, 18.

[115] Id. at 18.

[116] Id. at 93-99.

[117] Id. at 94.

[118] Id.

Feldman about a study where immediate symptoms were noticeable in only four of 13 cases.[119] This study appeared to contradict Dr. Feldman's assertion that a vast majority of children are immediately symptomatic and do not experience a lucid interval.

Morris argues that "the issue of lucid intervals is not disputed . . . ."[120] And he points to an article that cautions experts about making timing determinations in light of lucid intervals.[121] But Dr. Feldman did not dispute that lucid intervals could happen. Rather, he testified that such an event was unlikely in this case. Morris fails to explain how the studies he now cites call this testimony into question. Moreover, trial counsel discussed lucid intervals in closing argument, pointed to studies supporting her theory, and argued that Dr. Feldman could not establish the timing of the injury.[122]

Morris also asserts that if trial counsel had used the studies available on the issue of lucid intervals, "she could have established through Dr. Feldman the facts supporting a motion to dismiss: That he could not state precisely when the injury occurred."[123] But trial counsel was able to make this argument without relying on these studies. Thus, this is not persuasive.

---

[119] Id. at 97-98.

[120] Memorandum in Support of CrR 7.8 Motion for Relief from Judgment or Order at 37.

[121] Id. at App. Z (M.G.F. Gilliland, Interval Duration Between Injury and Severe Symptoms in Non-accidental Head Trauma in Infants and Young Children, 43 J. FORENSIC SCI. 723, 724 (1998)).

[122] Report of Proceedings (June 10, 13, 2011) at 789-91.

[123] Memorandum in Support of CrR 7.8 Motion for Relief from Judgment or Order at 39.

Finally, even if we agreed that counsel's performance was deficient for any of these reasons, Morris fails in his burden to show prejudice. There is simply no showing in this record that "but for counsel's unprofessional errors, the result of the proceeding would have been different."[124] We reach this conclusion for several reasons.

First, the main thrust of Morris's challenge is to the admission of evidence by Dr. Feldman. This tactic ignores other significant evidence in this record.

For example, an ophthalmologist at Harborview found severe bleeding in both of A.M.'s retinas on the day she was admitted to that hospital. When transferred to Children's, Dr. Herlihy, another ophthalmologist, examined A.M. to evaluate her injuries. This doctor diagnosed her as suffering from severe retinal hemorrhages in both eyes.[125] In making her diagnosis, she identified and then eliminated a number of potential causes for the injuries.[126] She then concluded that the damage was due to severe head trauma because nothing else was likely to have caused the injuries sustained by A.M.[127] She further testified that hemorrhages to this extent would not be caused by an accidental fall or minor jostling.[128] She stated that with hemorrhages like this, it was severe head trauma

---

[124] Strickland, 466 U.S. at 694.

[125] Report of Proceedings (June 6, 2011) at 301-05.

[126] Id. at 307-12.

[127] Id. at 312.

[128] Id. at 313.

"either from a shaking force or a fall off of a 13-story building."[129]

Six weeks after this initial examination, the doctor examined A.M. again. Her conclusions remained unchanged.

Second, we have the undisputed fact that A.M. had been "acting normally" that day, according to her mother's testimony. Nothing had changed when she left A.M. with her father that night. Ten minutes after she left the baby with Morris, the incident we described earlier in this opinion started.

Third, we have Morris's statements. He admitted to investigating officers that he shook A.M. twice, the second time harder than the first. And Morris sent A.M.'s mother a text message admitting that he had shaken A.M. and apologized, questioning if he was a bad parent.

Accordingly, had the court excluded the evidence provided by Dr. Feldman, it is unlikely the outcome of this case would have been different due to the matters we just discussed. Because the evidence provided by Dr. Feldman was properly admitted and neither the evidence we just discussed nor the other evidence in the record at trial that was not challenged by Morris in this proceeding, we conclude that he fails to show prejudice.

At oral argument in this proceeding, Morris advanced the theory that Dr. Feldman's testimony was the only evidence of timing of the injuries.

But as we just discussed, Morris admitted twice shaking the child when she was in his care, 10 minutes after her mother left acting normally. He also admitted shaking her harder the second time. His text message to the mother, apologizing for shaking her, is also relevant and material.

---

[129] Id. at 314.

24

Given this and the other evidence at trial, a jury could find beyond a reasonable doubt that Morris caused the injuries when the child was in his care and that the injuries were caused by him shaking her. This record simply does not rationally support any other scenario. Thus, the exclusion of Dr. Feldman's testimony would not undermine the jury's verdict.

## DUE PROCESS

Finally, Morris argues that his due process rights were violated "by the State's presentation of evidence it knew, or should have known was false and misleading."[130] We disagree.

Morris cites federal cases either involving Brady violations or cases where a witness lied on the stand. But unlike those cases, the facts of this case do not support the conclusion that the evidence was either false or misleading. Rather, the record shows that there were differences in opinion about the issue of causation. This does not give rise to a due process violation.

We deny his petition for relief.

Cox, J.

WE CONCUR:

Leach, J.

---

[130] Memorandum in Support of CrR 7.8 Motion for Relief from Judgment or Order at 1-2.