# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| In the Matter of the Personal Restraint of: | No.  54108-4-II |
| JOSEPH LEROY FUGLE, | |
| Petitioner, | UNPUBLISHED OPINION |

LEE, C.J. — Joseph L. Fugle seeks relief from personal restraint following his convictions for first degree child molestation, two counts of first degree rape of a child, and second degree rape of a child.  In this personal restraint petition (PRP), Fugle alleges that (1) his constitutional right to a jury trial was violated when the State's witnesses were permitted to offer improper opinion testimony as to his guilt, (2) his right to due process was violated when the State's witnesses testified to scientific evidence that does not satisfy the *Frye*[1] standard, and (3) he received ineffective assistance of counsel.  We deny Fugle's PRP.

FACTS

A.    CRIMINAL CHARGES

The State charged Fugle with one count of first degree child molestation, two counts of first degree rape of a child, and one count of second degree rape of a child based on allegations made by Fugle's stepson, M.G.[2]  M.G. alleged that Fugle sexually abused him for seven years.

---

[1]  *Frye v. United States*, 293 F. 1013, 34 A.L.R. 145 (D.C. Cir.1923).

[2]  Because M.G. was a child at the time of the abuse we use his initials to protect his privacy. General Order 2011-1 of Division II, *The Use of Initials or Pseudonyms for Child Witnesses in Sex Crime Cases* (Wash. Ct. App.).

At Fugle's trial, M.G. testified that Fugle abused him from the age of 7 until approximately 14. M.G. detailed numerous acts of sexual abuse Fugle committed against him. M.G. further testified about the threats of violence Fugle used to prevent M.G. from disclosing the abuse.

M.G. also testified regarding the various physical, emotional, and memory conditions he had experienced since the abuse stopped. M.G. stated that he did not recall the abuse from 14-18 years old. M.G. explained he began to remember the abuse when he began experiencing flashbacks at age 18. Prior to experiencing the flashbacks, M.G. had his gallbladder removed. M.G. also suffered from chronic pain and fatigue. M.G. saw various medical doctors to determine the cause of the pain and fatigue, but no physical cause of the pain and fatigue was identified.

When M.G. began having flashbacks of the abuse, he told his maternal grandmother, Jeanette Jepson. A short time later, M.G. and Jepson told M.G.'s mother, Jana Fugle.

After these disclosures, M.G. suffered a pseudoseizure[3] which resulted in his hospitalization. M.G. testified that, after the pseudoseizure, he was left with no personal memories except for memories of the sexual abuse committed by Fugle. Approximately two months after suffering the pseudoseizure, M.G. reported the abuse to law enforcement.

B.      STATE'S MEDICAL TESTIMONY AT TRIAL

The State presented testimony from M.G.'s treating physicians and counselors. Each witness's testimony relevant to this PRP is summarized below.

Dr. John Daniel is a family physician who was treating M.G. as his primary care provider. Dr. Daniel began treating M.G. in 2013 because of M.G.'s worsening pain and fatigue. Dr. Daniel

---

[3] A pseudoseizure is a term for a seizure that occurs without corresponding epileptic brain activity.

diagnosed M.G. with suffering from fibromyalgia and referred him to the University of Washington to confirm the diagnosis. Dr. Daniel also referred M.G. to a rheumatologist, gastroenterologist, and a neurologist. Dr. Daniel saw M.G. again a few months later because the pain had not improved and neither the rheumatologist nor the University of Washington had been able to identify a cause. Dr. Daniel advised M.G. to continue to see the remaining specialists. Dr. Daniel also saw M.G. after his pseudoseizure and dissociative amnesia. Although Dr. Daniel noted that M.G. had been diagnosed with PTSD and dissociative amnesia, Dr. Daniel explained those diagnoses came from outside medical sources.

Dr. Susan Poole is a psychologist who specializes in trauma counseling. Dr. Poole testified that she was a clinician familiar with PTSD and dissociative disorders from treating patients presenting with those disorders. Dr. Poole also testified that about one-third to one-half of her case load is comprised of patients with PTSD. She explained a patient is diagnosed with PTSD using the criteria in the Diagnostic and Statistical Manual Fifth Edition (DSM-5). Similarly, dissociative amnesia can be associated with PTSD and is diagnosed with the DSM-5.

Dr. Poole began treating M.G. in April 2014. When M.G. first met with Dr. Poole, he told her he wanted to deal "with the symptoms and struggle he was having after having been sexually abused by his stepfather [Fugle]." VI VRP at 551. After the initial session Dr. Poole diagnosed M.G. with PTSD and dissociative amnesia. When specifically asked to describe dissociative amnesia, Dr. Poole explained,

> So dissociative amnesia is an inability to recollect parts of one's memory. So they can be entirely general for all memories. It can be specific. We commonly see, with trauma, some form of dissociative amnesia for certain memories. That's very common where, over time, different memories will come back in time, but it can

3

be all the way to extreme of having no memories for periods of time. It can also be specific to certain types of relationships as well.

VI VRP at 546-47.

Dr. Poole began regular individual therapy sessions with M.G. as part of his treatment. Over time, M.G. began to share more information about his memories of the abuse. Dr. Poole testified that when M.G. shared his memories, her primary role was simply to listen to him. She testified that she did not ever help him develop specific memories because counselors have to be careful about not inserting any memories that are not actually there. When explaining how M.G.'s disclosure of his memories developed during therapy, Dr. Poole testified,

> [Dr. Poole:] He just told me that—I'm not sure what the triggering event was around that. I just know that he began to have flashbacks and nightmares is the way in which that the memories returned.
>
> . . . .
>
> [STATE:] Well, based on your training and experience, is there something that can cause them to suddenly come back?
>
> [Dr. Poole:] And that—yes, there could be. Certainly, just the fact of being older and suddenly being—perceiving being safer. The memories—at some point, the subconscious realizes that it does not have to protect in the same way. There may have been an event or something that had that occur as well, but he did not report on what that triggering event was to me.

VI VRP at 560-62. Dr. Poole clarified that the memories were not completely gone, but instead there was just a problem with retrieving the specific memory.

Dr. Poole also testified that she last saw M.G. regularly a year and a half before the trial. However, she had met with him prior to trial to help him cope with his anxiety over testifying. During these sessions, M.G. reviewed the timeline of the abuse. Dr. Poole clarified that M.G.'s

review of the timeline of the abuse was "exactly the same" and "came from him." VI VRP at 565. Finally, Dr. Poole testified that M.G.'s symptoms were consistent with a person who had suffered childhood trauma.

On cross-examination, Dr. Poole explicitly stated that, as a therapist and clinician she accepted what her patients told her as true. It is not her role to question what patients report. Dr. Poole also clarified that a diagnosis for the purposes of therapy was not the same as a forensic diagnosis.

Dr. David Tauben is a physician that specializes in pain management. Dr. Tauben began treating M.G. when he was referred for unexplained widespread pain and associated neurological and endocrinological difficulties. By the time he saw Dr. Tauben, M.G. had already seen numerous other specialists in an attempt to find a cause for his chronic pain. Dr. Tauben referred M.G. to a neurologist for some neurological testing. After the workup was completed, no physiological cause had been identified for the pain, and Dr. Tauben was concerned about M.G.'s degree of psychological distress.

Dr. Tauben scheduled an appointment with M.G. on July 3, 2014, to discuss the next steps of M.G.'s diagnosis and treatment. During the July 3 appointment, M.G. informed Dr. Tauben about the abuse, PTSD, and dissociative amnesia. Dr. Tauben administered a four question screening questionnaire for PTSD.

Dr. Tauben testified that based on the criteria in DSM-5, he diagnosed M.G. with "Post traumatic stress disorder from prolonged interval sexual abuse. Physical symptoms generated by central nervous system sensitization consequent to abuse exposure." VRP (6/13/16) at 725. Dr. Tauben also testified that PTSD often presents with physical symptoms such as chronic pain and

that understanding PTSD is an important part of treating the presentation of chronic pain. Dr. Tauben explained that "[w]idespread muscle pain and his fatigue could be fully accounted for, in my judgment and experience, by the early life sexual abuse exposure." VRP (6/13/16) 725. Dr. Tauben also explained that, although he will suggest that a patient's pain may be related to PTSD, he is very careful to not to suggest a particular type a trauma that caused the PTSD or chronic pain. Dr. Tauben noted that a wide variety of experiences or events can result in PTSD and associated chronic pain.

On cross examination, Dr. Tauben repeatedly explained that his diagnosis was based on self-reported information provided by M.G. Tauben also stated that he accepted M.G.'s statements because it was not his role to contest M.G.'s assertions.

## C. VERDICT, SENTENCING, AND DIRECT APPEAL

The jury found Fugle guilty of all four charged counts. The trial court imposed a standard range sentence. Fugle appealed his conviction and sentence.[4]

On direct appeal, Fugle argued that the trial court erred by admitting expert testimony regarding delayed disclosure and by limiting the scope of M.G.'s cross-examination. Fugle also argued that insufficient evidence supported the jury's verdict. Fugle also challenged his offender score and voir dire. We affirmed Fugle's convictions and sentence, and issued a mandate terminating review on October 9, 2018.[5]

---

[4] *State v. Fugle*, (Wash. Ct. App. May 8, 2018) (unpublished),
http://www.courts.wa.gov/opinions/pdf/D2%2049332-2-II%20Unpublished%20Opinion.pdf

[5] *Mandate*, No. 49332-2-II (October 9, 2018).

D.      ADDITIONAL EVIDENCE SUBMITTED IN SUPPORT OF THE PRP

Fugle has submitted three categories of additional evidence in support of his PRP: (1) scientific evidence in the form of expert declarations, (2) interviews and emails from Fugle's friends and neighbors, and (3) evidence regarding Fugle's trial counsel's actions during the trial.

Fugle submitted three expert declarations regarding memory and the link between trauma and PTSD. Dr. Gerald Rosen is a clinical psychologist. Dr. Rosen declared that PTSD symptoms cannot prove the validity of the alleged stressor that is claimed to have caused the symptoms. He also opined that therapists' opinions are vulnerable to error because they rely exclusively on what patients report and, therefore, cannot substitute for forensic assessments and diagnosis. Dr. Rosen also explained how false memories can be based on a person's sincere belief and can have significant effects on the people who hold them. Finally, Dr. Rosen documented the intense debate over the existence of repressed and recovered memories.

Dr. Daniel Reisberg, who testified at trial, submitted an additional declaration after reviewing the trial testimony of the State's medical witnesses. Dr. Reisberg claims that the ideas of repressed or suppressed memories and dissociative amnesia would not meet the *Frye* test for admissibility. He also noted that dissociative amnesia is related to the forgetting of memories and has nothing to do with whether those memories can be recovered in the future. Dr. Reisberg asserts that the scientific evidence makes it more likely that M.G.'s memories are false memories, rather than repressed and recovered true memories.

Dr. Mark Whitehill is a licensed psychologist specializing in conducting forensic evaluations and investigations. Dr. Whitehill declared that M.G.'s therapeutic assessments were insufficient to establish a valid diagnosis. He also opined that a diagnosis of PTSD does not

indicate that the symptoms were caused by a particular trauma. Dr. Whitehill claimed that there is no scientific basis supporting the idea that M.G. recovered repressed memories of abuse. Dr. Whitehill also claimed that it was more likely M.G. was suffering from a factitious disorder rather than PTSD. A factitious disorder is a condition in which a person, without a malingering motive, acts as if they have an illness by deliberately producing, feigning, or exaggerating symptoms, purely to attain a patient's role. Dr. Whitehill concluded by noting that he had never, in 32 years of practice, encountered a fact pattern as unusual as the one presented in this case.

Fugle also submitted emails and interviews with Fugle's friends, family, and neighbors supporting Fugle. And Fugle submitted a declaration from his mother which claimed that M.G. intended to break up his mother's marriage to Fugle and that she often saw M.G. exaggerate his physical ailments in front of his mother. Similarly, interviews with Fugle's neighbors, the Van Nettas and the Pagays, conducted before trial identify specific times neighbors believed they saw M.G. faking symptoms of illness, manipulating his mother with his physical ailments, lying in general, acting inconsistently with his claimed amnesia, and expressing a desire to break up Fugle's marriage with his mother.

Finally, Fugle submitted some emails between the State and Fugle's trial counsel. These emails generally establish that, although trial counsel initially attempted to schedule interviews with the State's medical witnesses, trial counsel did not actually interview the witnesses prior to trial.

One of the attorneys working on Fugle's PRP also submitted a declaration outlining some of his contacts with trial counsel while preparing the PRP. The declaration states that trial counsel was asked to submit a declaration but was unable to do so before the deadline to file the PRP.

Because trial counsel did not submit a declaration, Fugle's PRP attorney submitted the declaration to communicate "the general gist that I understand [trial counsel's] position to be regarding several of the points I am making on Mr. Fugle's behalf." Petition (Appx. H.) at 3.[6] Specifically, the declaration noted that trial counsel did not remember if he interviewed the State's medical witnesses but was not surprised by their trial testimony. The declaration also noted that trial counsel stated that he did not request a *Frye* hearing because none of the State's witnesses were identified as expert witnesses. And the declaration noted that trial counsel stated that he did not call Fugle's neighbors as witnesses because of a strategic decision made during trial.

ANALYSIS

A.      STANDARDS FOR RELIEF IN A PRP

"Relief by way of collateral challenge to a conviction is extraordinary, and the petitioner must meet a high standard before this court will disturb an otherwise settled judgment." *In re Pers. Restraint of Coats*, 173 Wn.2d 123, 132, 267 P.3d 324 (2011). To be entitled to relief in a PRP, the petitioner must show either (1) a constitutional error resulting in actual and substantial prejudice, or (2) "a fundamental defect of a nonconstitutional nature that inherently resulted in a complete miscarriage of justice."[7] *In re Pers. Restraint of Finstad*, 177 Wn.2d 501, 506, 301 P.3d

---

[6] We note that Appendix H of the Petition, Declaration of Mick Woynaroski, does not contain page numbers. Thus, for purposes of this opinion, we number the pages 1-8 starting from the first page of the declaration.

[7] The State extensively argues that our review of the issues raised in Fugle's PRP are barred from review by RAP 2.5(a) because they were not raised in the trial court. However, our Supreme Court has stated, "As to RAP 2.5, this rule pertains to the court's discretion to hear issues on appeal or review that were not objected to at trial. The rule does not govern a petitioner's burden in a PRP." *In re Pers. Restraint of Stockwell*, 179 Wn.2d 588, 602, 316 P.3d 1007 (2014).

450 (2013). When reviewing a PRP, we may (1) deny the petition, (2) grant the petition, or (3) transfer the petition to the superior court for a reference hearing. *In re Pers. Restraint of Yates*, 177 Wn.2d 1, 17, 296 P.3d 872 (2013); *In re Pers. Restraint of Schreiber*, 189 Wn. App. 110, 113, 357 P.3d 668 (2015).

When the petitioner's allegations are based on matters outside of the existing record, the petitioner must show that competent, admissible evidence supports the allegations. *In re Pers. Restraint of Rice*, 118 Wn.2d 876, 886, 828 P.2d 1086, *cert. denied*, 506 U.S. 958 (1992). If the evidence is based on knowledge that is in the possession of others, the petitioner must present affidavits of those witnesses or else other corroborative evidence. *Id*. Factual allegations must be based on more than speculation, conjecture, or inadmissible hearsay. *Id*.

B.    COMPETENT, ADMISSIBLE EVIDENCE

As an initial matter, we must determine what evidence is properly considered in support of Fugle's PRP. Although Fugle has attached a significant amount of information to his PRP, not all of it is competent, admissible evidence that warrants consideration. *Id*. As noted above, Fugle has

---

Here, we are presented with a PRP, which is a collateral attack, rather than a direct appeal.

As a general rule, "collateral attack by [PRP] on a criminal conviction and sentence should not simply be a reiteration of issues finally resolved at trial and direct review, but rather should raise new points of fact and law that were not or could not have been raised in the principal action, to the prejudice of the defendant."

*In re Pers. Restraint of Davis*, 152 Wn.2d 647, 670-71, 101 P.3d 1 (2004) (footnote omitted) (quoting *In re Pers. Restraint of Gentry*, 137 Wn.2d 378, 388-89, 972 P.2d 1250 (1999)). Therefore, rather than addressing whether Fugle raises issues for the first time on appeal—a direct appeal standard—we address whether Fugle has met his burden to establish grounds for relief in a PRP: a constitutional error resulting in actual and substantial prejudice or a fundamental defect of a nonconstitutional nature that inherently resulted in a complete miscarriage of justice.

submitted three categories of additional evidence in support of his PRP: (1) scientific evidence in the form of expert declarations, (2) interviews and emails from Fugle's friends and neighbors, and (3) evidence regarding Fugle's trial counsel's actions during the trial. Each is addressed below.

1. *Scientific Evidence*

Fugle submitted expert declarations as scientific evidence. All the expert declarations are properly sworn and based on the expert's knowledge, training, and experience. Thus, the scientific evidence submitted with the PRP is properly before this court. *See id.*

2. *Evidence from Friends and Neighbors*

The declaration from Fugle's mother in the form of a sworn declaration is properly before this court. *See id.* However, Fugle also submitted various evidence from Fugle's friends and neighbors, the majority of which is not competent, admissible evidence.

The emails from Fugle's friends and neighbors are not accompanied by any authenticating affidavits or declarations and are therefore not competent, admissible evidence. *Id.* ER 901(a) requires authentication as a condition precedent to the admissibility of emails. Authentication of an email requires testimony from someone with personal knowledge that can establish the email is what it purports to be. ER 901(b)(10). Because Fugle has not submitted any affidavits or declarations authenticating the emails from his friends and family, they are not competent, admissible evidence. *Rice*, 118 Wn.2d at 886.

Similarly, the interview summaries that Fugle submitted are inadmissible hearsay. "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." ER 801(c). Hearsay is inadmissible unless an exception or exclusion applies. ER 802. Here, although the investigator

who conducted the interviews submitted a declaration authenticating the interview summaries themselves, the declaration does not address the hearsay statements contained in the interview summaries. The statements Fugle's friends and neighbors made to the investigator and outlined in the interview summaries are inadmissible hearsay. *See Rice*, 118 Wn.2d at 886. Therefore, the statements in the interview summaries are not competent, admissible evidence that Fugle can rely on to support his claims.

> 3.      *Evidence Regarding Trial Counsel's Action*

In support of his claims regarding ineffective assistance of counsel, Fugle submitted emails between the State and Fugle's trial counsel. Fugle also submitted a declaration from his PRP counsel regarding PRP counsel's general understanding of trial counsel's statements relating to the issues raised on appeal.

Like the emails from Fugle's friends and neighbors, the emails between the State and Fugle's trial counsel are unauthenticated. Therefore, the emails are inadmissible under ER 901. Accordingly, the emails between the State and Fugle's trial counsel are not competent, admissible evidence that can support Fugle's claims. *Rice*, 118 Wn.2d at 886.

And the declaration from Fugle's PRP counsel is not competent, admissible evidence regarding trial counsel's statements. To the extent that the declaration recites statements made by Fugle's trial counsel, trial counsel's alleged statements are inadmissible hearsay. ER 801, ER 802. Any information regarding the reasons for trial counsel's decisions is knowledge within trial counsel's possession. Therefore, the appropriate mechanism for presenting that evidence is through a proper affidavit or declaration from trial counsel. *Rice*, 118 Wn.2d at 886. Accordingly, Fugle has not presented competent, admissible evidence regarding his trial counsel's statements.

C.     OPINION TESTIMONY VIOLATING THE RIGHT TO A JURY TRIAL

First, Fugle argues that his right to a jury trial was violated when the State's witnesses opined on his guilt by testifying that M.G.'s PTSD diagnosis was related to sexual abuse. Given the facts of this case, we disagree.

Generally, no witness may offer testimony in the form of an opinion regarding the guilt or veracity of the defendant; such testimony is unfairly prejudicial to the defendant because it invades the exclusive province of the jury. *State v. Kirkman*, 159 Wn.2d 918, 927, 155 P.3d 125 (2007) (citing *State v. Demery*, 144 Wn.2d 753, 759, 30 P.3d 1278 (2001)). Opinion testimony "can be defined as 'testimony based on one's belief or idea rather than on direct knowledge of the facts at issue.'" *Demery*, 144 Wn.2d at 760 (quoting BLACK'S LAW DICTIONARY 1486 (7th ed. 1999)). Because impermissible opinion testimony invades the province of the jury, it is a constitutional error. *Kirkman*, 159 Wn.2d at 927.

*State v. Florczak*, 76 Wn. App. 55, 74, 882 P.2d 199 (1994), *review denied*, 126 Wn.2d 1010 (1995), discusses the line between a proper opinion regarding a medical diagnosis of PTSD and an improper opinion that invades the province of the jury. Testimony about a diagnosis of PTSD is not improper when it is based on identifying the behavioral symptoms that support the diagnosis. *Id*. As long as the testimony does not state that a PTSD diagnosis or the associated behaviors substantiate the claim the sexual abuse occurred, no error results from the admission of that testimony. *Id*. However, when the witness identifies the specific trauma that caused the victim's PTSD—indicating that the witness reached an independent determination that the trauma actually occurred—then the witness improperly renders an opinion on an ultimate fact within the

13

province of the jury. *Id*. Furthermore, if the defendant is the only person implicated as the potential abuser, such testimony also amounts to an improper opinion on the defendant's guilt. *Id*.

However, there are factual distinctions between *Florczak* and this case, which make the apparent rule in *Florczak* inapplicable here. In *Florczak*, the investigation was initiated because, during a traffic stop, police officers found the defendants in possession of a sexually explicit nude photograph of the victim, K.T. *Id*. at 58. K.T. was three years old at the time. *Id*. Based on the discovery of the photograph, K.T. was referred for assessment at the Eastside Sexual Assault Center for Children for "an opinion about whether the photograph caused any injury to KT and whether any other abuse had occurred." *Id*. at 59. The social worker who performed the assessment testified, "'When we give the child post-traumatic stress, it can be to any traumatic event. It is secondary, in this case, in [K.T.]'s case, to sexual abuse.'" *Id*. at 62. It does not appear that K.T. testified at the trial. *Id*. at 58-63.

In contrast, here, M.G. was a teenager at the time he saw Dr. Poole, Dr. Daniel, and Dr. Tauben. And none of these witnesses saw M.G. with the purpose of determining whether sexual abuse took place. Rather, Dr. Poole, Dr. Daniel, and Dr. Tauben were all treatment providers M.G. saw in order to deal with the physical and psychological symptoms he was experiencing. Most significantly, these witnesses clearly testified that, in their role as a treatment provider, they accepted M.G.'s statements as true, without making any independent assessment as to veracity.

In *Florczak*, the social worker's testimony was an improper opinion on K.T.'s veracity and the defendants' guilt because it necessarily implied that the social worker evaluated the truth of K.T.'s disclosures and concluded they were sufficiently reliable to determine that sexual abuse had occurred. Here, the challenged witnesses offered no opinion on M.G.'s veracity or on Fugle's

14

guilt because it was established that, in their role as treatment providers, they accepted M.G.'s disclosures as true without making an independent assessment of their reliability or veracity. And it was not the treatment providers' role to assess whether any actual abuse occurred, but only to develop a treatment plan for M.G.'s complaints. Even Fugle's expert, Dr. Rosen, agreed that the therapists' opinions rely exclusively on what the patient reports.

Furthermore, M.G. testified extensively at trial and the jury had the opportunity to assess his credibility themselves. Unlike, *Florczak,* the State's witnesses, testifying as M.G.'s treatment providers, did not offer an improper opinion on M.G.'s veracity or Fugle's guilt because it was clear from their testimony that they merely accepted M.G.'s statements as true without making an independent assessment.

Fugle points to specific testimony that referenced the reported abuse allegations or the treatment providers' testimony that stated Fugle's reports were consistent with the diagnosis. For example, Fugle points to Dr. Tauben's diagnosis of PTSD secondary to sexual abuse. Fugle also notes that Dr. Poole testified that she saw M.G. for the purpose of treating the symptoms "'he was having after having been sexually abused by his stepfather Joe.'" Br. of Petitioner at 46 (emphasis omitted) (quoting VI VRP at 551). Although taken out of context, this testimony may appear to be improper, the context of the treatment providers' testimony does not establish that the testimony was an improper opinion on Fugle's guilt or M.G.'s credibility.

Under the law, the focus of the analysis is whether the testimony implies that the witness has formed an opinion on the witness's veracity or the defendant's guilt. Context is important for considering whether testimony is an improper opinion, and we consider "'(1) the type of witness involved, (2) the specific nature of the testimony, (3) the nature of the charges, (4) the type of

15

defense, and (5) the other evidence before the trier of fact.'" *Kirkman*, 159 Wn.2d at 928 (internal quotation marks omitted) (quoting *State v. Demery*, 144 Wn.2d at 759). Here, these factors demonstrate that the treatment providers did not offer an impermissible opinion on guilt.

As to the first factor, the treatment providers testified as treatment providers. Unlike police officers or forensic evaluators, their role as treatment providers does not imply that their job is to make a determination regarding the truth of the allegations or the defendant's guilt. For example, if a police offer makes an arrest based on the victim's statement, it necessarily implies that the police officer has determined that the victim is telling the truth or that the defendant is guilty. In contrast, treatment providers are providing treatment and their diagnosis does not carry any additional significance regarding the truth of the allegations or the defendant's guilt.

As to the second factor, the nature of the testimony weighs in favor of determining that the testimony was not improper. As noted above, the treatment providers specifically testified that they simply accepted M.G.'s statements as true. Therefore, the testimony does not contain an implied opinion regarding M.G.'s truth because the treatment providers merely accepted M.G.'s statements as true and did not *form* any opinion regarding M.G.'s veracity. *See id* at 930-31 (Detective's testimony that he tested the witness's competence and truthfulness prior to taking her statement was not improper testimony because it was simply an account of interview protocol.).

The third and fourth factors likely do not weigh in favor of determining that there was improper opinion testimony. Here, the charges were based on the allegations that formed the basis of the treatment providers' diagnosis and treatment plan. And Fugle's defense was a general denial, based, in part, on attacking M.G.'s credibility. However, although the treatment providers testified that M.G.'s allegations were consistent with the diagnosis of PTSD, they also testified

16

that *any* trauma could create the symptoms of PTSD that M.G. reported. Therefore, the treatment providers' testimony did not necessarily imply that M.G.'s account was credible.

The fifth factor weighs in favor of determining that there was no improper opinion testimony. M.G. testified in detail regarding the allegations of abuse, and therefore, the jury had an opportunity to make their own determination regarding his credibility. And, as part of his defense, Fugle presented expert testimony that questioned the reliability of M.G.'s memories and alleged memory condition. *See id* at 931 (Despite a witness's opinion regarding another witness's veracity, juries are still required to determine the credibility and truthfulness of each witness.).

Given the context of the treatment providers' testimony and the factors considered when determining whether there was improper opinion testimony, we conclude that the treatment providers in this case did not offer improper opinion testimony. Because there was no improper opinion testimony, Fugle has not met his burden to show a constitutional error resulting in actual and substantial prejudice. Accordingly, we deny Fugle's PRP based on the admission of improper opinion testimony.

D.      EXPERT OPINIONS ADMITTED WITHOUT A *FRYE* HEARING

Fugle argues that the evidence introduced is not generally accepted in the scientific community and therefore was inadmissible expert testimony under *Frye*. Specifically, Fugle challenges the evidence that claimed "symptoms of PTSD can be reverse-engineered to establish a specific prior cause" and promoted the "notion of 'repressed-recovered memory.'" Br. of Petitioner at 5.

Fugle attempts to frame the admission of scientific evidence without a *Frye* hearing as a constitutional error related to his right to due process. Although Fugle asserts that scientific

evidence admitted without a *Frye* hearing violates his "due process right not to have to defend against unreliable evidence," no authority establishing that such a constitutional right exists. Br. of Petitioner at 71.[8] Washington courts have regularly held that admission of scientific evidence without a *Frye* hearing does not involve a constitutional issue. *See State v. Newbern*, 95 Wn. App. 277, 288, 975 P.2d 1041, *review denied*, 138 Wn.2d 1018 (1999); *Florczak*, 76 Wn. App. at 72; *State v. Jones*, 71 Wn. App. 798, 820-21, 863 P.2d 85 (1993), *review denied*, 124 Wn.2d 1018 (1994). Therefore, Fugle's assertion that the State's witnesses offered scientific evidence that was inadmissible under *Frye* alleges a nonconstitutional error. Accordingly, Fugle must show that the admission of the scientific evidence at issue was a fundamental defect resulting in a complete miscarriage of justice. *Finstad*, 177 Wn.2d at 506.

Washington courts evaluate expert testimony under the *Frye* test. *In re Pers. Restraint of Morris*, 189 Wn. App. 484, 492, 355 P.3d 355 (2015). "'The *Frye* standard requires a trial court to determine whether a scientific theory or principle has achieved general acceptance in the relevant scientific community before admitting it into evidence.'" *Id.* (internal quotation marks omitted) (quoting *In re Det. of Thorell*, 149 Wn.2d 724, 754, 72 P.3d 708 (2003), *cert. denied*, 541 U.S. 990 (2004)). "'[T]he core concern . . . is only whether the evidence being offered is based on

---

[8] Fugle cites *Manson v. Brathwaite*, 432 U.S. 98, 113-14, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977), to assert that the "admission of unreliable evidence violates the Fourteenth Amendment's Due Process Clause." Br. of Pet. at 61 n.32. However, *Manson*, discusses reliability as a factor in determining the admissibility of identifications that may have resulted from inherently suggestive procedures. 432 U.S. at 113-14. *Manson* only establishes that admission of identifications that result from inherently suggestive procedures is improper and unconstitutional. *Id.* It does not relate to the admissibility of scientific evidence under *Frye*, it does not establish a due process right not to defend against unreliable evidence, and it does not extend past the admissibility of identifications.

established scientific methodology.'" *Id*. at 492-93 (alterations in original) (internal quotation marks omitted) (quoting *In re Det. of Thorell*, 149 Wn.2d at 754).

However, *Frye* applies to the admissibility of evidence based on *novel* scientific theories, principles, or procedures. *In re Detention of Young*, 122 Wn.2d 1, 56, 857 P.2d 989 (1993), *superseded by statute on other grounds as stated in Thorell*, 149 Wn.2d at 746. In *Young*, our Supreme Court determined that the "sciences of psychology and psychiatry are not novel" and, therefore, *Frye* does not prevent admission of evidence regarding psychological diagnoses and predictions of future dangerousness even when those diagnoses or predictions are uncertain or debated by other experts in the field. *Id.* at 56-57.

The same reasoning applies here. Dr. Tauben, Dr. Poole, and Dr. Daniel did not testify as experts in the field of memory, or even as experts in forensic assessment and diagnosis. They testified only in their role as treatment providers in their respective fields. To the extent they offered testimony regarding memories, it was clear that testimony was based on their experience and role as treatment providers and clinicians, not based on their opinion as experts in the field of memory. Therefore, their testimony was not subject to *Frye* because it was not based on novel scientific theories, principles, or procedures; rather, their testimony was based on well-established principles of psychology used to treat a patient.

Fugle also claims that the State's witnesses testified that symptoms of PTSD could be "reverse-engineered" to prove that a particular trauma occurred. Br. of Petitioner at 5. However, a review of the testimony in this case shows that no such statement was made to the jury. All the State's witnesses admitted the PTSD symptoms can result from any type of traumatic event. And in their experience treating M.G., their diagnosis of PTSD was informed by his disclosure of an

19

event—sexual abuse—that would result in the symptoms he complained of. None of the challenged witnesses testified that any of M.G.'s symptoms were exclusively caused by sexual abuse or that the presence of PTSD proved that the sexual abuse occurred. Instead, the challenged witnesses all recognized that symptoms of PTSD could be caused by any type of trauma. Therefore, this claim is not supported by the testimony at trial.

Because none of the testimony Fugle complains of was novel and subject to *Frye*, Fugle has failed to show the absence of a *Frye* hearing was a fundamental defect resulting in a complete miscarriage of justice. Accordingly, Fugle's challenge based on the failure to hold a *Frye* hearing fails.

E.      INEFFECTIVE ASSISTANCE OF COUNSEL

Finally, Fugle asserts that he received ineffective assistance of counsel because counsel (1) failed to object to the improper opinion testimony or alternatively, failed to adequately raise the issue on direct appeal, (2) failed to move to exclude improper scientific evidence under *Frye*, (3) failed to investigate the relevant scientific evidence, and (4) failed to call Fugle's mother and neighbors as defense witnesses. Because Fugle has not presented any competent, admissible evidence that establishes the reasons for trial counsel's decisions, Fugle has failed to meet his burden to show deficient performance.

To prevail on an ineffective assistance of counsel claim, the defendant must show both that defense counsel's representation was deficient and the deficient performance resulted in prejudice to the defendant. *State v. Grier*, 171 Wn.2d 17, 32-33, 246 P.3d 1260 (2011), *cert. denied*, 574 U.S. 860 (2014). A petitioner who presents a successful ineffective assistance of counsel claim necessarily establishes actual and substantial prejudice for purposes of collateral relief in a

personal restraint petition. *In re Pers. Restraint of Crace*, 174 Wn.2d 835, 846-47, 280 P.3d 1102 (2012).

Counsel's performance is deficient if it falls below an objective standard of reasonableness. *Grier*, 171 Wn.2d at 33. We engage in a strong presumption that counsel's performance was reasonable. *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009). A defendant may overcome this presumption by showing that "'there is no conceivable legitimate tactic explaining counsel's performance.'" *Grier*, 171 Wn.2d at 33 (quoting *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004)). There must be evidence on counsel's strategic or tactical decisions in order for this court to determine whether counsel's performance was deficient. *State v. Linville*, 191 Wn.2d 513, 525-26, 423 P.3d 842 (2018). To establish prejudice, the defendant must "prove that there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different." *Kyllo*, 166 Wn.2d at 862.

1. *Failure to Object to Improper Opinion Testimony*

Fugle argues that he received ineffective assistance of counsel because trial counsel failed to object to the allegedly improper opinion testimony. The decision regarding whether and when to object to trial testimony is a "classic example[] of trial tactics." *State v. Crow*, 8 Wn. App. 2d 480, 508, 438 P.3d 541, *review denied*, 193 Wn.2d 1038 (2019). Therefore, the reason not to object, as well as the fact that those reasons are neither strategic nor legitimate, must be supported by evidence. *Linville,* 191 Wn.2d at 525-26.

Here, as discussed above, the State's witnesses did not offer any improper opinion testimony. Therefore, there was no improper opinion testimony that would have warranted an

21

objection and trial counsel's performance was not deficient. Accordingly, Fugle's ineffective assistance of counsel claim based on the failure to object to improper opinion testimony fails.[9]

Fugle also argues that he received ineffective assistance of appellate counsel because his counsel for his direct appeal failed to raise the issue regarding improper opinion testimony on direct appeal. A petitioner claiming he received ineffective assistance of appellate counsel must show that the legal issue that counsel failed to raise had merit and must then show that he was prejudiced by appellate counsel's failure to raise the issue. *In re Pers. Restraint of Dalluge*, 152 Wn.2d 772, 777-78, 100 P.3d 279 (2004). Because we hold that the State's witnesses did not offer improper opinion testimony, then Fugle has failed to show that the issue had merit. Therefore, Fugle has failed to meet his burden to show ineffective assistance of appellate counsel.

2. *Failure to Move to Exclude Improper Scientific Evidence*

Fugle claims that trial counsel was ineffective because he failed to request a *Frye* hearing regarding the testimonies of Dr. Tauben, Dr, Poole, and Dr. Daniel. As noted above, the challenged testimony was not subject to *Frye*, and therefore, there was no basis for requesting a *Frye* hearing. Accordingly, trial counsel's performance was not deficient for failing to request a *Frye* hearing.

---

[9] Even if we assume the State's witnesses did offer improper opinion testimony, then the reasons for trial counsel's failure to object have not been properly established with competent, admissible evidence. *Rice*, 118 Wn.2d at 886. Here, Fugle presents only an affidavit from one of his attorneys working on his PRP to establish an understanding of why trial counsel did not object. This declaration is not competent, admissible evidence of trial counsel's reasons for failing to object. *Rice*, 118 Wn.2d at 886. Instead, Fugle is required to submit an affidavit from trial counsel to establish the reasons for the failure to object. *Id.* Because of Fugle's failure to do so, there is no evidence that allows us to evaluate whether the reasons for the failure to object are strategic or legitimate. *Linville*, 191 Wn.2d at 525-26.

Furthermore, there is no competent, admissible evidence that explains trial counsel's reasons for failing to request a *Frye* hearing. Therefore, there is no evidence that allows us to evaluate whether the reasons for the failure to object are strategic or legitimate. *Linville*, 191 Wn.2d at 525-26. Accordingly, Fugle has failed to meet his burden to show trial counsel's performance was deficient for failure to request a *Frye* hearing.

3.      *Failure to Investigate Scientific Evidence*

Fugle claims that his trial counsel was ineffective for failing to properly investigate the scientific evidence in this case. An attorney breaches his duty to his client when he fails "'to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'" *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 721, 101 P.3d 1 (2004) (quoting *Strickland v. Washington*, 466 U.S. 668, 690-91, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). "Defense counsel must, 'at a minimum, *conduct a reasonable investigation* enabling [counsel] to make informed decisions about how best to represent [the] client.'" *Davis*, 152 Wn.2d at 721 (alterations in original) (quoting *In re Pers. Restraint of Brett*, 142 Wn.2d 868, 873, 16 P.3d 601 (2001)). "This includes investigating all reasonable lines of defense." *Davis*, 152 Wn.2d at 721

Here, as noted above, there is no competent, admissible evidence establishing what investigation trial counsel actually performed and the reasons why trial counsel chose to pursue the defense he did. *Linville*, 191 Wn.2d at 525-26; *Rice*, 118 Wn.2d at 886. Therefore, Fugle has failed to meet his burden to show that his trial counsel's performance was deficient for failing to investigate the scientific evidence in this case.

4.      *Failure to Call Witnesses*

Fugle asserts that he received ineffective assistance of counsel because trial counsel failed to call his family and neighbors as witnesses. In general, the decision whether to call a particular witness at trial is subject to differences of opinion, and therefore, we presume that such a decision is a matter of legitimate trial tactics. *In re Pers. Restraint of Lui*, 188 Wn.2d 525, 545, 397 P.3d 90 (2017).

As discussed above, there is no competent, admissible evidence that establishes trial counsel's reasons for deciding not to call Fugle's family and neighbors as witnesses. *Rice*, 118 Wn.2d at 886. Therefore, there is no evidence from which we can determine the reasons for trial counsel's decision and whether those reasons are strategic or legitimate. *Linville*, 191 Wn.2d at 525-26. Moreover, even if we accepted Fugle's PRP counsel's declaration as competent, admissible evidence, it clearly states that the reasons for not calling these witnesses was a strategic decision. Therefore, Fugle's ineffective assistance of counsel claim fails.

Fugle has not shown either a constitutional error resulting in actual and substantial prejudice or a fundamental defect of a nonconsitutional nature that inherently resulted in a complete miscarriage of justice. Therefore, we deny his PRP.

No. 54108-4-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

, C.J.

Lee, C.J.

We concur:

Glasgow, J.

Cruser, J.