IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,

          Respondent,

          v.

DAMIEN CHARLES McCARTER,

          Appellant.

No. 85919-6-I

DIVISION ONE

UNPUBLISHED OPINION

HAZELRIGG, A.C.J. — Damien McCarter appeals his conviction after a jury trial for murder in the second degree—felony murder—with a domestic violence designation, based on assault of a child in the first degree. McCarter contends that the State's medical witnesses provided improper opinion testimony, the prosecutor committed misconduct in closing, and the trial court erred in limiting his closing argument. He also avers the trial court erred in imposing an exceptional sentence, in particular, challenging the sufficiency of the evidence as to the two aggravating factors found by the jury. Because the only error was the court's limitation on defense counsel's closing argument, which was harmless beyond a reasonable doubt, we affirm.

FACTS

On December 9, 2019, the State charged Damien McCarter with murder in the second degree—felony murder—based on assault of a child in the first degree, and further alleged it was a crime of domestic violence. Thereafter, the State filed

an amended information that included two additional aggravating circumstances: that AM was a particularly vulnerable victim and McCarter abused a position of trust. On December 3, 2019, officers responded to Mary Bridge Hospital and spoke with medical staff regarding a 2-month-old child, AM, who had suffered a decompressed skull fracture and several bilateral rib fractures while in the care of his father, McCarter. AM ultimately succumbed to his injuries and passed away on December 4, 2019.

The parties litigated a number of pretrial issues through motions in limine and the jury trial began on May 16, 2022. Jennifer McCarter,[1] McCarter's wife and AM's mother testified that her husband was the only person home with AM at the time of the incident on December 3. In response to an e-mail from McCarter that said, "I fell with [AM] going down stairs," Jennifer explained that she immediately left work and drove home where she found McCarter and AM waiting for her. McCarter then told Jennifer that AM "had been dropped in his car seat and that he wasn't responding."[2] Jennifer drove them to St. Michael's Medical Center.

---

[1] Because they share the same last name, we refer to the defendant as McCarter and Jennifer by her first name for clarity. No disrespect is intended

[2] In an interview with Detective Jennifer Rice, McCarter described the incident as follows:

> He said that he put [AM] in his car seat and it was on the dining room table. He said he strapped [AM] in. He buckled him in. Everything was fastened except for the final adjustment of the harness. He picked up the car seat with his right arm in the back and his left arm in the front, and he lifted it off of the dining room table in a parallel fashion. As he turned—as he rotated, his left hand hit the back of a—hit a dining room chair on the back of his left knuckles, and he said that it was a zinger to his knuckle, and he just released the car seat. He described it as his—the momentum of his turning and hitting the dining room chair that his right hand flipped the car seat over and it landed face[ ]down on a carpeted floor. He said that [AM] was face[ ]down.

Rice recorded McCarter reenacting this incident in the home and that video was admitted as State's Exhibit 37 and played for the jury at trial.

Jennifer testified that due to the extent of the injuries, AM was airlifted to Mary Bridge Medical Center and, shortly after she arrived at Mary Bridge, the doctors there informed her that AM would not survive.

The State presented testimony from numerous medical witnesses. Dr. Jason Tanguay, an emergency medicine physician, treated AM at St. Michael's. He recalled that AM had facial bruising and "needed imaging of the brain." The imaging showed "a skull fracture, and there was a significant associated intracranial hemorrhage." Dr. Jeffrey Flaskerud, a pediatric emergency medicine physician at Mary Bridge, also treated AM. Flaskerud testified that AM "had a depressed right-sided skull fracture" and both "left-sided subdural" and "left-sided subarachnoid" hemorrhages. Additionally, AM had several bilateral rib fractures. Flaskerud opined that the injuries were inconsistent with the claimed mechanism of AM falling in a car seat because the "patient had left ear bruising, an area of injury under the right eye, swelling on the right side of the head. That's three different traumas, not just one." Flaskerud testified that it was "not possible, based on [his] training and experience," that all of AM's injuries resulted from a single fall. Further, Flaskerud stated that "rib fractures in pediatric patients" are "highly suggestive of abuse" and AM's elevated liver enzymes also suggested "[t]rauma" or "abuse." Dr. John Whitt, a pediatric intensive care physician at Mary Bridge, cared for AM as well and testified that AM's injuries could not be explained by the car seat; rather, they were consistent with "nonaccidental trauma." This conclusion was shared by Drs. Ronald Grondin, Tito Monge, and Mauricio Escobar, all of whom worked at Mary Bridge and examined or treated AM.

Dr. Sarah Ann Farley, a pediatric radiologist,[3] found a linear fracture on the side of AM's head and an "overlying hematoma[4] within the scalp." According to Farley, this was a "severe traumatic brain injury" with "evidence of direct head trauma." Farley also identified multiple rib fractures, some of which showed evidence of healing. She concluded that, overall, the findings were "very strongly associated with nonaccidental trauma."[5] Dr. Aditya Sunijda, a pediatric radiologist, testified that she was most concerned by AM's scan that showed "blood products of varying ages within the brain," which indicates "they were different times of injury." Sunijda stated that such findings are most commonly seen in "nonaccidental trauma or child abuse."

Dr. Kenneth Feldman is a pediatrician with Children's University Medical Group and was qualified as an expert in child abuse. He opined that AM's "injuries were indicative of repetitive child abuse." Feldman testified at length that a single fall could not cause AM's injuries as there was "evidence of bilateral impact trauma on opposite sides of the skull," the type of head injuries AM sustained are "virtually unheard of with normal short falls," and such "short falls essentially never cause rib fracture." Dr. Jeffrey Otjen, a pediatric radiologist, testified as an expert on child abuse and concluded, based on his review of AM's scans, that "given the totality of the imaging findings, nonaccidental trauma was the diagnosis." He explained that AM had "too many injuries to be accounted for by a single fall or drop." Dr.

---

[3] Farley explained that she is a diagnostic radiologist with "subspecialty training in imaging pediatric patients." She also clarified that a "diagnostic radiologist is a physician who has specialized training in interpreting medical imaging."

[4] Farley defined a hematoma as "a collection of blood."

[5] Farley is trained in recognizing "nonaccidental trauma," which she described as "traumatic injuries that are not typically seen in the context of accidental injury mechanisms."

Andrew Rosenberg, a pathologist, reviewed AM's histological[6] slides and opined that AM suffered "at least two episodes of severe trauma" and "based on the distribution and types of trauma to the skeleton, it was secondary to physical child abuse." Dr. Emmanuel Lacsina, a forensic pathologist who performed an autopsy on AM, concluded that the "cause of death [wa]s due to multiple blunt force injuries to the head." He ruled the death a homicide. Lacsina testified that "the severity and multiplicity of the injuries indicate that they are inflicted injuries rather than injuries sustained from an accident."

McCarter testified in his own defense and reenacted his version of the incident with AM's car seat at trial. At the time of the incident, according to McCarter, AM was "fully strapped in" to the car seat, which had a five-point harness. Defense medical experts provided testimony in support of McCarter's version of events. Dr. Robert Bux, a forensic pathologist, testified that AM had "metabolic bone disease" and opined that the car seat fall described by McCarter could result in the injuries to AM. Dr. David Ayoub, a diagnostic radiologist, also opined that AM's skeletal images "showed significant metabolic bone disease," specifically, "rickets." Ayoub testified that many of the injuries could be explained by a single fall with the car seat. Dr. Marta Cohen, a pediatric pathologist licensed in the United Kingdom, similarly concluded AM had "metabolic bone disease." Dr. Dale Vaslow, a neuroradiologist, testified that AM's injuries were attributable to "a

---

[6] Rosenberg defined "histological materials" as "microscopic. . . features that are present in the bone tissue." He further explained that histological slides are those created for use with a microscope by slicing "extremely thin sections of tissues" and "staining them with dyes so they can be easily visible. . . under the microscope" and that "the name of the slide that contains the stained tissue is a histological slide."

traumatic blow to the head." The defense also called a biomechanical expert, Dr. Chris Allen Van Ee, who concluded that AM's head injuries "could have occurred as a result of the fall." Van Ee testified on cross-examination that he had done "a lot of work, looking at chest injury . . . as well as rib fractures and when they occur" and "even looked at rib fractures in children." However, Van Ee offered no opinion on AM's rib injuries.

The jury found McCarter guilty as charged and returned special verdicts finding the State had proved that AM and McCarter were members of the same family or household for purposes of the domestic violence designation, along with the aggravating factors of a particularly vulnerable victim and use of a position of trust. The trial court determined that the special verdicts were a sufficient factual basis to support an exceptional sentence above McCarter's standard range. Accordingly, the judge imposed 360 months in prison and entered corresponding findings of fact and conclusions of law.

McCarter timely appealed.

ANALYSIS

I. Testimony on "Abusive Head Trauma" and "Nonaccidental Trauma"

McCarter first assigns error to the trial court's ruling allowing the State's expert witnesses to opine that AM's injuries were the result of "abusive head trauma" and/or "nonaccidental trauma." He avers the testimony failed to satisfy the test set out in *Frye v. United States*, 54 U.S. App. D.C. 46, 47, 293 F. 1013

(1923), and invaded the province of the jury with regard to fact-finding. Neither argument holds merit.[7]

A.    *Frye* Test

"The standard governing the admissibility of testimony based on scientific experimental procedures at a criminal trial was enunciated in *Frye.*" *State v. Martin*, 101 Wn.2d 713, 719, 684 P.2d 651 (1984). Under the *Frye* test, "evidence deriving from a scientific theory or principle is admissible only if that theory or principle has achieved general acceptance in the relevant scientific community." *Id.* Admissibility under *Frye* is subject to de novo review, which "may extend beyond the record and involve consideration of scientific literature as well as secondary legal authority." *State v. Copeland,* 130 Wn.2d 244, 255-56, 922 P.2d 1304 (1996).

"The *Frye* test is implicated only where the opinion offered is based upon novel science." *Anderson v. Akzo Nobel Coatings, Inc.,* 172 Wn.2d 593, 611, 260 P.3d 857 (2011). "It applies where either the theory and technique or the method of arriving at the data relied upon is *so novel that it is not generally accepted by the relevant scientific community*." *Id.* (emphasis added). Courts consider "(1) whether the underlying theory is generally accepted in the scientific community and (2) whether there are techniques, experiments, or studies utilizing that theory

---

[7] In his reply brief, McCarter shifts his argument on this issue to ER 403, the basis for the defense objection presented in motions in limine, and contends the trial court erred in admitting the testimony of abusive head trauma because it was "substantially more prejudicial than probative." Far from raising this argument in his opening brief, McCarter fails to even mention ER 403 until his reply. "'A contention presented for the first time in the reply brief will not receive consideration on appeal.'" *State v. Tien Thuy Ho*, 8 Wn. App. 2d 132, 140-41, 437 P.3d 726 (2019) (quoting *Fosbre v. State*, 70 Wn.2d 578, 583, 424 P.2d 901 (1967)). Thus, we do not reach the ER 403 argument on this challenge.

which are capable of producing reliable results and are generally accepted in the scientific community." *State v. Riker*, 123 Wn.2d 351, 359, 869 P.2d 43 (1994).

In motions in limine, McCarter challenged Feldman's proposed testimony about "abusive head trauma" on the ground that it was "scientifically and medically unreliable." He also moved to exclude any reference to "abusive head trauma" under ER 403 and on the basis that the phrase invaded the province of the jury. However, McCarter did not present a challenge based on *Frye* at trial; the case is not cited in his motions in limine before the trial court and the only reference to the *Frye* standard contained in the record before us is from the State's motion to suppress Van Ee's testimony concerning his "novel experiment."[8] In response to the State's contention in briefing that McCarter waived the issue by not raising it until this appeal, he simply insists that "*Frye* is still important to the argument."

"Failure to object to the admissibility of evidence at trial precludes appellate review of that issue unless the alleged error involves manifest error affecting a constitutional right." *State v. Florczak*, 76 Wn. App. 55, 72, 882 P.2d 199 (1994). To satisfy RAP 2.5(a)(3) and raise such an error for the first time on appeal, "an

---

[8] While McCarter sought to exclude Feldman's testimony of "abusive head trauma" and compared it to "shaken baby syndrome," which, he contended, "lacked a solid scientific foundation," McCarter neither explicitly raised *Frye* nor challenged the *methodology* of the State's expert opinions in relation to abusive head trauma and nonaccidental trauma. "'The core concern [of *Frye*] is only whether the evidence being offered is based on established scientific methodology.'" *In re Pers. Restraint of Morris*, 189 Wn. App. 484, 492-93, 355 P.3d 355 (2015) (internal quotation marks omitted) (quoting *In re Det. of Thorell*, 149 Wn.2d 724, 754, 72 P.3d 708 (2003)). Thus, it is clear that McCarter's challenge in the trial court was not based on *Frye*.

Rather, McCarter's objection to the State's expert testimony at trial was ostensibly an ER 702 challenge, despite the fact that the evidence rule was not explicitly cited as the basis for his motion to exclude this testimony. For expert testimony to be admissible, "ER 702 requires that (1) the witness is qualified as an expert and (2) the testimony would be helpful to the trier of fact." *State v. Thomas*, 123 Wn. App. 771, 778, 98 P.3d 1258 (2004). "Expert testimony is helpful if it concerns matters beyond the common knowledge of the average layperson and does not mislead the jury." *Id.* However, as McCarter does not argue ER 702 on appeal, we need not consider whether the State's expert testimony was admissible under that rule.

appellant must demonstrate (1) the error is manifest, and (2) the error is truly of constitutional dimension." *State v. O'Hara*, 167 Wn.2d 91, 98, 217 P.3d 756 (2009). "Failure to lay an adequate foundation under *Frye* does not create manifest constitutional error." *State v. Newbern*, 95 Wn. App. 277, 288, 975 P.2d 1041 (1999). Thus, "[w]hen a party fails to raise a *Frye* argument below, a reviewing court need not consider it on appeal." *In re Det. of Taylor*, 132 Wn. App. 827, 836, 134 P.3d 254 (2006); *see also State v. Hettich*, 70 Wn. App. 586, 592, 854 P.2d 1112 (1993) ("[T]he *Frye* argument was not raised below, and therefore need not be considered on appeal."). Because McCarter did not raise the *Frye* issue in the trial court, the challenge is waived.[9]

B.    Invading the Province of the Jury

McCarter avers that an opinion that a child suffered "abusive head trauma" or "nonaccidental trauma" is not a diagnosis, but, rather, "a legal conclusion that the accused is guilty of a crime." We disagree.

"No witness, lay or expert, may testify to [their] opinion as to the guilt of a defendant, whether by direct statement or inference." *State v. Black*, 109 Wn.2d 336, 348, 745 P.2d 12 (1987). "Impermissible opinion testimony regarding the defendant's guilt may be reversible error because such evidence violates the defendant's constitutional right to a jury trial, which includes the independent determination of the facts by the jury." *State v. Kirkman*, 159 Wn.2d 918, 927, 155 P.3d 125 (2007). But "if the testimony does not directly comment on the

---

[9] Even on the merits, the *Frye* challenge would likely fail as this court has held that evidence of "abusive head trauma" as a diagnosis satisfies the *Frye* standard. *See Morris*, 189 Wn. App. at 493-94.

defendant's guilt or veracity, helps the jury, and is based on inferences from the evidence, it is not improper opinion testimony." *State v. Johnson*, 152 Wn. App. 924, 930-31, 219 P.3d 958 (2009).

McCarter argues that the opinions of the various medical experts that AM's injuries were the result of "abusive," "nonaccidental," or "inflicted" trauma were improper as they implied the actus reus, or wrongful act, of assault, which was an ultimate issue of fact for the jury to determine. To convict McCarter of murder in the second degree—felony murder—the State was required to prove he caused AM's death in the course of committing assault of a child in the first degree against AM. RCW 9A.32.050(1)(b). Although the expert testimony did imply the actus reus of assault of a child, an expert may express an "opinion on a proper subject even though [they] thereby express[] an opinion on the ultimate fact to be found by the trier of fact." *Kirkman*, 159 Wn.2d at 929. "The mere fact that the opinion of an expert covers an issue which the jury has to pass upon, does not call for automatic exclusion." *Id.*

McCarter relies on *Florczak*, wherein one of the defendants, Terrell, appealed convictions for one count of child molestation in the first degree and one count of sexual exploitation of a minor against her three-year-old daughter, KT. 76 Wn. App. at 57-58. Wilson, a social worker who had treated KT, provided an expert opinion at trial that KT suffered from post-traumatic stress syndrome, which was "secondary, in this case, in KT's case, to sexual abuse." *Id.* at 74. On review, this court explained that the expert had "rendered an opinion of ultimate fact—whether KT had been sexually abused—which was for the jury alone to decide." *Id.*

- 10 -

"Because only Terrell and Florczak were implicated as possible abusers, this segment of Wilson's testimony amounted to an opinion that they were guilty, either individually or jointly, of sexually abusing KT." *Id.* The court held that the opinion invaded the province of the jury, but also concluded that the error was harmless. *Id*. at 74-75.

Unlike Wilson's opinion testimony in *Florczak*, which only implicated the defendants as the abusers, the State's experts here did not exclusively implicate McCarter as the one responsible for all of AM's injuries. While the expert opinions did assert that the injuries strongly suggested that AM was intentionally harmed, touching upon an ultimate issue of fact for the jury, the experts concluded that some of AM's injuries occurred at different points in time, not just on the day of the incident when McCarter was watching the child. Additionally, in *Florczak*, the State charged the defendants based upon one photograph that showed Terrell and KT in the nude and KT's allegation that the defendants had sexually abused her on numerous occasions. 76 Wn. App. at 58-59. Here, however, the physical evidence of AM's injuries was overwhelming and the expert testimony characterizing those injuries as resulting from "abusive head trauma" and "nonaccidental trauma" did not take away the jury's role in finding whether the injuries occurred by outside force at all, as opposed to a bone disease, or who was responsible for them. Another critical point of distinction from *Florczak* is the fact that this court has recognized "abusive head trauma" as a valid diagnosis. *In re Pers. Restraint of Morris*, 189 Wn. App. 484, 493-94, 355 P.3d 355 (2015). Finally, while McCarter challenges the opinions offered by a number of experts as they

- 11 -

pertained to "abusive head trauma" or "nonaccidental trauma," it is noteworthy that he does not challenge the opinion of the forensic pathologist who performed AM's autopsy. Lacsina expressly concluded that the "cause of death [wa]s due to multiple blunt force injuries to the head" and ruled the child's death a homicide.

No expert witness directly commented on McCarter's guilt or otherwise testified that McCarter intentionally harmed AM, and no expert witness offered an opinion as to the specific mechanism that caused AM's injuries. Rather, each concluded, based on their respective training, experience, and review of AM's medical records, reports, and imaging, that the injuries were due to "nonaccidental trauma" and "abusive head trauma," which was helpful to the jury in determining the cause of AM's injuries and whether those injuries could have been sustained by one short fall as suggested by McCarter's theory of the case. Thus, the testimony regarding nonaccidental trauma and abusive head trauma was not improper and the trial court did not err in admitting it.

## II. Prosecutorial Misconduct in Closing Argument

McCarter next claims the prosecutor committed misconduct in closing argument by shifting the burden of proof. According to McCarter, the prosecutor did so by suggesting defense expert Van Ee needed to explain AM's rib fractures.

"[T]o prevail on a claim of prosecutorial misconduct, the defendant bears the burden of showing that the comments were improper and that they were prejudicial." *State v. Ish*, 170 Wn.2d 189, 195, 241 P.3d 389 (2010). "Allegedly improper arguments should be reviewed in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions

given." *State v. Russell*, 125 Wn.2d 24, 85-86, 882 P.2d 747 (1994). "Prejudice is established only if there is a substantial likelihood the instances of misconduct affected the jury's verdict." *State v. Pirtle,* 127 Wn.2d 628, 672, 904 P.2d 245 (1995). "Reversal is not required if the error could have been obviated by a curative instruction which the defense did not request." *Russell*, 125 Wn.2d at 85.

Prosecutors have "wide latitude to argue reasonable inferences from the evidence," but it is improper "to argue that the burden of proof rests with the defendant." *State v. Thorgerson*, 172 Wn.2d 438, 453, 258 P.3d 43 (2011). "Generally, a prosecutor cannot comment on the lack of defense evidence because the defendant has no duty to present evidence." *State v. Cheatam*, 150 Wn.2d 626, 652, 81 P.3d 830 (2003). However, "the mere mention that defense evidence is lacking does not constitute prosecutorial misconduct or shift the burden of proof to the defense." *State v. Jackson*, 150 Wn. App. 877, 885-86, 209 P.3d 553 (2009).

McCarter points to the following portion of the State's closing argument:

[State]: Here's where there's a large hole in the defense theory of the case with their biomechanical expert. Dr. Van Ee was not asked to opine on whether the rib fractures could have resulted from this alleged fall, despite the fact he testified that he had done lots of work in chest injuries, rib fractures, seat belts, and car seats, so he certainly could have offered an opinion there. The only experts that do say the rib fractures were consistent are Dr. Ayoub, and he's not a biomechanical expert.
     And why wasn't Dr. Van Ee asked to provide an explanation for the rib fractures? Because those injuries would not have occurred in the fall described—

[Defense]: Objection, Your Honor.

The trial court overruled the objection and explained the "argument that was made is that there's certain things that Dr. Van Ee did not testify to, that he did not give an explanation about, that he has qualifications to give perhaps some opinions and did not." When the jury returned, the prosecutor continued: "So why didn't Dr. Van Ee provide an explanation for the rib fractures? Because they were not caused by that fall. And Dr. Tencer testified to that."

This was not improper burden shifting. In limited circumstances, "[a] prosecutor can comment on the accused's failure to present evidence on a particular issue if persons other than the accused or [their] spouse could have testified for [them] on that issue." *State v. Bebb*, 44 Wn. App. 803, 815, 723 P.2d 512 (1986), *aff'd,* 108 Wn.2d 515, 740 P.2d 829 (1987). So long as the defendant testifies, "prosecutors are permitted to comment on a defendant's failure to produce corroborative evidence to support their testimony and [] such comments do not improperly shift the burden of proof." *State v. Sundberg*, 185 Wn.2d 147, 155-56, 370 P.3d 1 (2016).

Here, McCarter maintained that AM's injuries resulted from a single fall of a few feet onto a carpeted surface while strapped in a car seat that appeared to have a five-point harness; he testified to his version of events and provided two reenactments. However, McCarter's only biometrics expert, Van Ee, who had experience in pediatric rib fractures, was not asked to provide an opinion as to whether such a fall could result in AM's multiple bilateral rib fractures. Thus, even though the prosecutor commented on McCarter's failure to present evidence in

- 14 -

support of his testimony, the comment did not improperly shift the burden of proof. *See Id.*

III.     Trial Court Limitation of Defense Closing Argument

McCarter avers the trial court violated his "right to present a defense" by not allowing defense counsel to describe the reasonable doubt standard during closing argument.

The "right to present a defense" is the "right to offer the testimony of witnesses, and to compel their attendance, if necessary." *Washington v. Texas*, 388 U.S. 14, 19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967); *see also State v. Lizarraga*, 191 Wn. App. 530, 552, 364 P.3d 810 (2015) ("The fundamental due process right to present a defense is the right to offer testimony and compel the attendance of a witness."). This due process right is guaranteed by the Sixth Amendment to the United States Constitution and article I, section 22 of our state constitution. *Washington,* 388 U.S. at 19; *State v. Hudlow*, 99 Wn.2d 1, 14-15, 659 P.2d 514 (1983).

Separately, the Sixth Amendment ensures the right to assistance of counsel,[10] which "includes the right of counsel to argue the case to the jury," and this right may be infringed upon "where a trial court unduly limits the scope of defense counsel's closing argument." *State v. Frost*, 160 Wn.2d 765, 773, 161 P.3d 361 (2007). The complete denial of a defendant's right to have counsel

_____

[10] The Sixth Amendment guarantees criminal defendants "the rights to a 'speedy and public trial,' to an 'impartial jury,' to notice of the 'nature and cause of the accusation,' to be 'confronted' with opposing witnesses, to 'compulsory process' for defense witnesses, and to the 'Assistance of Counsel.'" *Herring v. New York*, 422 U.S. 853, 856-57, 95 S. Ct. 2550, 45 L. Ed. 2d 593 (1975).

provide any closing argument is a denial of "the assistance of counsel that the Constitution guarantees." *Herring v. New York*, 422 U.S. 853, 865, 95 S. Ct. 2550 45 L. Ed. 2d 593 (1975). While closing argument does implicate the defendant's due process and Sixth Amendment rights, *State v. Osman*, 192 Wn. App. 355, 368-69, 366 P.3d 956 (2016), closing argument is not, as McCarter asserts, "[a] critical part of the right to present a defense."

Rather, McCarter's challenge is based on the alleged violation of his right to "'have his counsel make a proper argument on the evidence and the applicable law in his favor.'" *Herring*, 422 U.S. at 860 (quoting *Yopps v. State*, 228 Md. 204, 207, 178 A.2d 879 (1962)). Accordingly, we review this claim as an improper limitation on closing argument, not as a violation of the "right to present a defense." The State concedes that the trial court's limitation was erroneous but contends that it was harmless. We agree with the State.

"Rulings by a trial court restricting the scope of argument are reviewed with a view toward determining if the trial court abused its discretion." *State v. Perez-Cervantes*, 141 Wn.2d 468, 475, 6 P.3d 1160 (2000). "A court abuses its discretion when an 'order is manifestly unreasonable or based on untenable grounds.'" *State v. Rafay*, 167 Wn.2d 644, 655, 222 P.3d 86 (2009) (quoting *Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 122 Wn.2d 299, 339, 858 P.2d 1054 (1993)). An abuse of discretion also occurs if the trial court "'base[s] its ruling on an erroneous view of the law.'" *Id.* (quoting *Fisons Corp.,* 122 Wn.2d at 339). "[T]he trial court should restrict the argument of counsel to the facts in evidence and the law as set forth in the instructions to the jury." *Osman*, 192 Wn. App. at

368. However, "[w]here a trial court goes too far in limiting the scope of closing argument, a defendant's constitutional rights may be implicated." *Frost,* 160 Wn.2d at 772.

In *Osman*, this court addressed the trial court's limitation on defense closing argument concerning the meaning of "'beyond a reasonable doubt.'" 192 Wn. App. at 373-74. During closing argument, Osman's attorney explained to the jury that "an abiding belief of the truth of the charge" meant that "you can't change your mind and look back and say I wonder if I made a mistake," whether it was "[a] month from now" or "[a] year from now." *Id.* at 374. The State objected and the trial court sustained the objection on the basis that the description of "abiding belief" was inaccurate. *Id.* On review, this court determined the trial court erred because defense counsel's argument "properly addressed the significance of having 'an abiding belief in the truth of the charge'" and it was "not an improper characterization of the reasonable doubt standard." *Id.* at 377.

Here, defense counsel described the burden of proof as follows:

> So again, you know, the standard being beyond a reasonable doubt, it's there because we're talking about the individual now. We're not talking about the general. You're not here to solve the mystery. You're here to hold the State to that burden.
> That's, you know, fortunate for you and for anybody that's charged with a crime. It's fortunate because [] McCarter can count on you to hold the State to that burden. Holding the State to that burden lets you and any other jury that serves be able to make a decision and leave and be confident in that decision ten and twenty years from now.

The State then objected and the trial court sustained the objection.

This ruling was erroneous. Similar to the attorney in *Osman* who properly used a duration of time to further explain an abiding belief, McCarter's counsel did

the same to describe the confidence that the jury should have in its decision. Although McCarter's proffered timeframe was longer than was determined reasonable in *Osman*, nothing in that holding restricted the duration to that which was provided in the facts of that case. Accordingly, as duration is a proper consideration with regard to an abiding belief and it does not mischaracterize the State's burden, the trial court erred in sustaining the State's objection to this argument by the defense.

An erroneous "limitation of the scope of closing affects the 'trial process itself' and is subject to a constitutional harmless error analysis." *Osman*, 192 Wn. App. at 377 (quoting *Frost*, 160 Wn.2d at 781-82) (internal quotations omitted). "In order to hold the error harmless, we must 'conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error.'" *State v. Brown*, 147 Wn.2d 330, 341, 58 P.3d 889 (2002) (quoting *Neder v. United States*, 527 U.S. 1, 19, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999)).

To convict McCarter of murder in the second degree—felony murder—the State had to prove he intentionally assaulted AM, an infant, and recklessly inflicted great bodily harm, which caused AM's death. RCW 9A.32.050(1)(b); 9A.36.120(1)(b)(i). Although the specific mechanism that caused the injuries to AM is unknown, McCarter confirmed that he was alone with AM when the injuries took place and Jennifer testified that AM was healthy prior to the incident. This strong circumstantial evidence provides a sufficient basis from which the jury could conclude McCarter was the one responsible for AM's severe injuries. Circumstantial evidence is just as reliable as direct evidence. *State v. Delmarter*,

94 Wn.2d 634, 638, 618 P.2d 99 (1980). While only McCarter knows exactly what took place on December 3 and he testified that an accidental fall caused the injuries to AM, numerous doctors who treated the infant testified that the nature and extent of those injuries contradicted McCarter's version of events. Specifically, the State's expert medical testimony was that AM's injuries could not have been the result of a single fall as his skull was fractured on one side and injured on the other, and that the infant suffered numerous rib fractures on both sides of his body that could not be explained by the car seat or the fall that McCarter described.

Additionally, the jury was provided a pattern jury instruction on the State's burden to prove each element of the crime beyond a reasonable doubt, which was defined therein as follows:

> A reasonable doubt is one for which a reason exists and may arise from the evidence or lack of evidence. It is such a doubt as would exist in the mind of a reasonable person after fully, fairly, and carefully considering all of the evidence or lack of evidence. If, from such consideration, you have an abiding belief in the truth of the charge, you are satisfied beyond a reasonable doubt.

This court "presume[s] the jury follows the instructions of the court." *Osman,* 192 Wn. App. at 379. Based on the testimony of numerous doctors who treated AM and medical experts who reviewed the medical evidence, as well as strong circumstantial evidence, we conclude beyond a reasonable doubt that the jury verdict would have been the same without the error.[11]

---

[11] McCarter also seeks reversal based on the "cumulative prejudice of multiple errors." The cumulative error doctrine "does not apply where the errors are few and have little or no effect on the trial's outcome." *State v. Venegas*, 155 Wn. App. 507, 520, 228 P.3d 813 (2010). Because only one error occurred, which was harmless beyond a reasonable doubt, the cumulative error doctrine is inapplicable here.

IV.    Exceptional Sentence above the Standard Range

McCarter's offender score after trial was calculated as 0, based on his lack of prior criminal history, and his standard sentencing range was determined to be 123-220 months in prison.  When the State seeks a sentence above the standard range, it must provide notice of the "aggravating circumstances upon which the requested sentence will be based."  RCW 9.94A.537(1).  The facts supporting aggravating circumstances must be proved beyond a reasonable doubt and the "jury's verdict on the aggravating factor[s] must be unanimous, and by special interrogatory."  RCW 9.94A.537(3).

The State sought an exceptional sentence above the standard range, based on the facts of the case and the jury's special verdicts as to the aggravating factors presented at trial.  It asked the court to impose 440 months in prison, "twice the top of the standard range."  Defense counsel objected and argued in its sentencing brief that the aggravators were

> already part of the underlying verdict of guilty to [s]econd [d]egree [m]urder where the predicate felony violation was [a]ssault of a [c]hild in the [f]irst [d]egree. It would be inconsistent for a jury to return a guilty verdict against a parent of a child for [a]ssault in the [f]irst [d]egree, and not find both that the child was a particularly vulnerable victim and that the [p]arent was in a position of trust.

The defense asked the court for a sentence within the standard range.  After hearing argument from the parties at sentencing, the court found that the jury had considered each aggravating factor under the relevant statute and "unanimously found that the circumstances [were] proved beyond a reasonable doubt."  It concluded that there were "substantial and compelling reasons to impose an

- 20 -

exceptional sentence," but declined to impose the 440 months requested by the State and instead sentenced McCarter to 360 months in prison.

McCarter assigns error to the exceptional sentence based on sufficiency of the evidence and, separately, to the trial court's conclusion that it was supported by substantial and compelling reasons. "[A]n exceptional sentence is subject to review only as set forth in RCW 9.94A.585(4)." *State v. Stubbs*, 170 Wn.2d 117, 123, 240 P.3d 143 (2010). That provision provides the following:

> To reverse a sentence which is outside the standard sentence range, the reviewing court must find: (a) Either that the reasons supplied by the sentencing court are not supported by the record which was before the judge or that those reasons do not justify a sentence outside the standard sentence range for that offense; or (b) that the sentence imposed was clearly excessive or clearly too lenient.

RCW 9.94A.585(4).

A. Sufficiency of the Evidence as to Aggravating Circumstances

This court reviews the jury's findings on aggravating circumstances under the sufficiency of the evidence standard. *Stubbs*, 170 Wn.2d at 123. Accordingly, we consider "the evidence in the light most favorable to the State to determine whether any rational trier of fact could have found the presence of the aggravating circumstances beyond a reasonable doubt." *State v. Chanthabouly*, 164 Wn. App. 104, 143, 262 P.3d 144 (2011). "[A]ll reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). And "circumstantial evidence is not to be considered any less reliable than direct evidence." *Delmarter*, 94 Wn.2d at 638.

- 21 -

Here, the State alleged two aggravating circumstances in the amended information: that AM was a particularly vulnerable victim under RCW 9.94A.535(3)(b), and that McCarter used his position of trust to facilitate the commission of the crime pursuant to RCW 9.94A.535(3)(n). The trial court instructed the jury on each of the aggravating circumstances, that the reasonable doubt standard applied when deciding these aspects of the case, and that the verdict on each of the aggravating factors must be unanimous. The jury found that the State had satisfied its burden to prove each one beyond a reasonable doubt. McCarter contends the "evidence does not support either aggravating factor." We disagree.

### 1. Particularly Vulnerable Victim

RCW 9.94A.535(3) provides that a sentencing court may depart from the applicable standard sentencing range where certain aggravating factors have been considered by a jury. One such circumstance is where the jury finds that the "defendant knew or should have known that the victim of the current offense was particularly vulnerable or incapable of resistance." RCW 9.94A.535(3)(b). For this aggravating circumstance to "justify an exceptional sentence, the State must show (1) that the defendant knew or should have known (2) of the victim's *particular* vulnerability and (3) that vulnerability must have been a substantial factor in the commission of the crime." *State v. Suleiman*, 158 Wn.2d 280, 291-92, 143 P.3d 795 (2006). Only the third prong is at issue here as McCarter concedes in briefing that "[a]s an immobile, preverbal newborn, A.M. likely had a particular vulnerability. And as A.M.'s father and caretaker, [] McCarter likely knew this."

In *State v. Berube*, our Supreme Court explained, "Extreme youth is a valid aggravating factor when considering the vulnerability of a victim." 150 Wn.2d 498, 513, 79 P.3d 1144 (2003). Berube was convicted of homicide by abuse and given an exceptional sentence based, in part, on the aggravating factor of the victim's vulnerability. *Id.* at 512. The victim was Berube's son, Kyle, who was only 23 months old at the time he was killed. *Id.* at 513. Kyle had numerous injuries and bruising across his body, and the cause of death was "blunt force impact to the head." *Id.* at 502. In addressing the aggravating factor of victim vulnerability, the court explained that Kyle was "less than two years old," he was "completely dependent on Berube and [the codefendant] for his well[-]being," he was "unable to communicate to any other adult about the abuse," and he lacked the "ability to defend himself or to call for help." *Id.* at 513.

The reasoning set out in *Berube* applies equally here. Not only was AM, like Kyle, the child of the defendant, but AM was 21 months younger than Kyle. As in *Berube*, the evidence here shows that AM was entirely dependent on McCarter for his care and survival on the day he was injured, and because AM could not speak, he could not communicate to any other adult, including his mother. It goes without saying that a two-month-old infant is unable to defend themselves, particularly against the physical force an adult is capable of generating. When the evidence is viewed in the light most favorable to the State, a rational trier of fact could have found AM to be a particularly vulnerable victim based on his extreme youth, which was a substantial factor as it enabled McCarter to inflict injuries as severe as those identified in AM by the various medical experts. Most critically,

the court instructed the jury on the third prong McCarter now challenges, that the "victim's vulnerability must also be a substantial factor in the commission of the crime" and that it was the State's burden to prove this fact beyond a reasonable doubt. Where, as here, there is no evidence of the contrary, the jury is presumed to have followed the instructions of the court. *Kirkman*, 159 Wn.2d at 928. Thus, we reject McCarter's challenge to the factual sufficiency of this aggravating factor.

### 2. Use of Position of Trust

RCW 9.94A.535(3)(n) defines another aggravating circumstance that can justify the imposition of an exceptional sentence as one where "[t]he defendant used [their] position of trust, confidence, or fiduciary responsibility to facilitate the commission of the current offense." To determine whether the defendant "abused a sufficient position of trust to merit an exceptional sentence," courts consider the duration and the degree of the relationship. *State v. Grewe*, 117 Wn.2d 211, 218, 813 P.2d 1238 (1991). "'A relationship extending over a longer period of time, or one within the same household, would indicate a more significant trust relationship, such that the offender's abuse of that relationship would be a more substantial reason for imposing an exceptional sentence.'" *Id.* at 219 (quoting *State v. Fisher*, 108 Wn.2d 419, 427, 739 P.2d 683 (1987)). The age of the victim is also considered; children are "among the most vulnerable members of society" and "[o]ne aspect of children's extreme vulnerability is their tendency to trust." *Id*. at 221.

In *Berube*, this aggravating factor was another basis for the exceptional sentence imposed. 150 Wn.2d at 513-14. The court noted the "fact that Berube

was Kyle's parent and [the codefendant] was a parent-figure gave them unmonitored access to Kyle." *Id.* at 513. Under the circumstances, the court held that "Berube and [the codefendant's] actions amounted to an abuse of their position of trust toward Kyle." *Id.* Here, just like the circumstances in *Berube*, McCarter was AM's father and he had unmonitored access to AM. Moreover, McCarter and AM lived in the same house together and their relationship spanned the entirety of AM's brief life. Again, AM was only two months old at the time of the incident; he was extremely vulnerable to McCarter who was able to inflict these injuries because of AM's age. When viewed in the light most favorable to the State, the evidence is sufficient for a reasonable juror to conclude that McCarter abused his position of trust to facilitate this crime. Just as with the particularly vulnerable victim aggravating factor, the record establishes that the jury was properly instructed on the statutory elements, the burden of proof and requirement for unanimity. Because we presume that the jury followed the court's instructions as to its duty with regard to this special verdict, McCarter has failed to demonstrate error on this issue.

B.      Substantial and Compelling Reasons To Impose Exceptional Sentence

McCarter's final challenge is to the trial court's "finding" of substantial and compelling reasons justifying the exceptional sentence. While this aspect of the trial court's ruling is set out as a conclusion of law, McCarter argues that this was an improper finding of fact by the judge that violated his constitutional right to a jury trial. We disagree.

"The Sixth Amendment to the United States Constitution guarantees criminal defendants a right to trial by jury." *State v. Sage*, 1 Wn. App. 2d 685, 707, 407 P.3d 359 (2017). In *Apprendi v. New Jersey*, the Supreme Court held, "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). Thereafter, the Court clarified that "the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum [they] may impose *without* any additional findings." *Blakely v. Washington*, 542 U.S. 296, 303-04, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004). In light of *Apprendi* and *Blakely*, our legislature amended the Sentencing Reform Act of 1981 (SRA), ch. 9.94A RCW, to require a jury to find "any facts supporting aggravating circumstances beyond a reasonable doubt and by special interrogatory." *Stubbs*, 170 Wn.2d at 123 (citing RCW 9.94A.537(3)); LAWS OF 2005, ch. 68, § 1.

Under RCW 9.94A.537(6), if the jury finds an aggravating circumstance, the trial court may impose a sentence beyond the standard range "*if it finds, considering the purposes of this chapter, that the facts found are substantial and compelling reasons justifying an exceptional sentence*." (Emphasis added.) McCarter argues that this judicial determination violates the Sixth Amendment because it allows for an increase in the sentence based on a "finding by the court."

This court has already considered and rejected the arguments McCarter now presents. *See Sage*, 1 Wn. App. 2d at 707-09. *Sage* explained that

"Washington cases recognize that once the jury by special verdict makes the factual determination whether aggravating circumstances have been proved beyond a reasonable doubt, 'the trial judge is left only with the legal conclusion of whether the facts alleged and found were sufficiently substantial and compelling to warrant an exceptional sentence.'" *Id.* at 708 (quoting *Suleiman*, 158 Wn.2d at 290-91). On this point, *Sage* included a lengthy footnote listing authority from our Supreme Court in support of its holding:

> "In the context of discussions about standard of review, this court has held that whether a court's stated reasons are sufficiently substantial and compelling to support an exceptional sentence is a question of law. *State v. Cardenas*, 129 Wn.2d 1, 6 n.1, 914 P.2d 57 (1997); *State v. Chadderton*, 119 Wn.2d 390, 399, 832 P.2d 481 (1992): *State v. Grewe*, 117 Wn.2d 211, 215-16, 813 P.2d 1238 (1991); *State v. Nordby*, 106 Wn.2d 514, 518, 723 P.2d 1117 (1986). In contrast, whether an aggravating factor is present in a particular case, in other words, whether a stated reason is supported by the record, is a factual determination. *Nordby*, 106 Wn.2d at 517-18; *see also Cardenas*, 129 Wn.2d at 5 (applying a clearly erroneous standard to this question); *State v. Fisher*, 108 Wn.2d 419, 423, 739 P.2d 683 (1987); *State v. Woody*, 48 Wn. App. 772, 776, 742 P.2d 133 (1987). Thus, whether a particular aggravating factor is supported by the record is a question of fact, while the question of whether the found factors are sufficiently substantial and compelling is a matter of law."

158 Wn. App. 2d at 708 n.80 (quoting *Suleiman*, 158 Wn.2d at 291 n.3).

*Sage* also distinguished *Hurst v. Florida*, 577 U.S. 92, 136 S. Ct. 616, 193 L. Ed. 2d 504 (2016), on which McCarter heavily relies for his contention that the judge's determination constituted a prohibited finding of fact.

> In *Hurst*, the Supreme Court held Florida's death penalty procedure violated the defendant's Sixth Amendment right to a jury trial because the jury's findings of aggravating factors were advisory, resulting in prohibited fact finding by the judge. But the Florida statute at issue expressly state[d] that the jury findings were "advisory." Former FLA. STAT. § 921.141 (2010). By contrast, under Washington procedure here, the jury exclusively resolves the factual question

whether the aggravating circumstances have been proven beyond a reasonable doubt.

*Sage,* 1 Wn. App. 2d at 710 n.86.

While McCarter acknowledges the contrary holding in *Sage*, he claims it was made "without reasoning or analysis." *Sage* is well reasoned and squarely on point; the opinion walks through the various procedural steps between verdict and sentencing and explains which involve legal determinations or factual determinations, including the proper party to reach them. 1 Wn. App. 2d at 709-710. Thus, we follow *Sage* as controlling authority and conclude that the trial judge did not engage in prohibited fact finding when it concluded under RCW 9.94A.537(6) that the jury found the aggravating factors had been proved beyond a reasonable doubt and that those aggravators provided the proper legal basis for an exceptional sentence outside McCarter's standard range.

Affirmed.

_____

WE CONCUR:

_____    _____

- 28 -